**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>17-2519</u>

CITIZENS FOR A HEALTHY COMMUNITY;

HIGH COUNTRY CONSERVATION ADVOCATES;

CENTER FOR BIOLOGICAL DIVERSITY;

and WILDEARTH GUARDIANS,

      Plaintiffs,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the U. S. Department of Interior;

RYAN ZINKE, in his official capacity as U.S. Secretary of the Interior;

DANA M. WILSON, in her official capacity as Acting Southwest District Manager;

      Federal Defendants.

---

**PETITION FOR REVIEW OF AGENCY ACTION AND INJUNCTIVE RELIEF**

---

Plaintiffs, CITIZENS FOR A HEALTHY COMMUNITY, HIGH COUNTRY

CONSERVATION ADVOCATES, CENTER FOR BIOLOGICAL DIVERSITY, and

WILDEARTH GUARDIANS (collectively "Conservation Groups") allege as follows:

## I.  INTRODUCTION

1. Conservation Groups bring this civil action for declaratory and injunctive relief against the above named Federal Defendants, UNITED STATES BUREAU OF LAND MANAGEMENT, RYAN ZINKE, and DANA M. WILSON (collectively "BLM" or "Defendants") in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, for violations of the National Environmental Policy Act 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), NEPA's implementing regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500.1 *et seq.*, as well as BLM regulations, 43 C.F.R. §§ 3160 *et seq.*

2. Plaintiffs' action arises from BLM's decision to approve the Bull Mountain Unit Master Development Plan ("Bull Mountain Unit MDP" or "proposed project") through an Environmental Impact Statement ("EIS") and Record of Decision ("ROD"). The Bull Mountain Unit MDP as approved allows for the construction of up to 33 new well pads, 146 new natural gas wells, and 4 new waste-water disposal wells. The new gas well and well pad figures include the approval of an Application for Permit to Drill ("APD") called 12-89-7-1. The approval of 12-89-7-1 APD is a 3 acre well pad, 25.3 acres for associated pipeline construction, and 7.5 acres to upgrade the access road to the well pad site.

3. These proposed natural gas activities are slated to take place 30 miles northeast of the Town of Paonia. The Bull Mountain Unit MDP consists of approximately 19,670 acres of federal and private subsurface mineral estate.

4.   BLM's approval through the EIS did not include a reasonable range of alternatives and/or take a hard look at the proposal's cumulative impacts.

5.   Conservation Groups seek a declaratory judgment and injunctive relief to remedy the violations complained of herein. Conservation Groups also seek an award of attorneys' fees, costs, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

## II.    JURISDICTION AND VENUE

6.   This action arises under NEPA, 42 U.S.C. §§ 4321-4370h.

7.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1346, because this action arises under the laws of the United States and involves the United States as a defendant.

8.   This action reflects an actual, present, and justiciable controversy between Conservation Groups and BLM. Conservation Groups' interests will be adversely affected and irreparably injured if BLM continues to violate NEPA and BLM regulations as alleged herein, and if this challenged decision is implemented. These injuries are concrete and particularized and fairly traceable to BLM's challenged decision, providing the requisite personal stake in the outcome of this controversy necessary for this Court's jurisdiction.

9.   The requested relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 and 706.  The challenged agency action is final and subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

10. Plaintiffs' claims ripened and accrued on October 4, 2017, when BLM took final
    agency action by noticing its issuance of its Record of Decision in the *Federal
    Register*. Notice of Availability of the Record of Decision for the Bull Mountain Unit
    Master Development Plan, Gunnison County, CO, 82 Fed. Reg. 46280 (Oct. 4, 2017).
    On information and belief, the Record of Decision is the first site-specific final agency
    action implementing the challenged Bull Mountain Unit MDP.

11. Conservation Groups have exhausted all required administrative remedies.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the final
    agency actions concern federal surface and minerals located in Colorado that BLM
    manages pursuant to federal statutes. Venue is also proper under 28 U.S.C. §
    1391(e)(1) because officers of the United States in Colorado are defendants, a
    substantial part of the events and omissions giving rise to this case occurred in BLM
    offices located in Colorado, Plaintiffs CHC and HCCA have offices and are
    headquartered in Colorado, Plaintiff Center for Biological Diversity has offices in
    Denver and Crested Butte, Colorado, and Plaintiff WildEarth Guardians has an office
    in Denver, Colorado.

## III.   PARTIES

13. Plaintiff CITIZENS FOR A HEALTHY COMMUNITY ("CHC") is a 500-member
    nonprofit organization located in Paonia, Colorado. CHC was founded in 2010 for the
    purpose of protecting the Delta County region's air, water, and foodsheds from the
    impact of oil and gas development. CHC's members and supporters include farmers,
    ranchers, vineyard and winery owners, and other concerned citizens impacted by oil

and gas development, who currently and plan to continue to live in, use, and enjoy the communities and landscapes affected by the challenged BLM action. CHC brings this action on its own behalf and on behalf of its adversely affected members.

14. Plaintiff HIGH COUNTRY CONSERVATION ADVOCATES ("HCCA") is a nonprofit organization located in Crested Butte, Colorado with over 950 members. HCCA was founded in 1977 to conserve and protect wild places, rivers, and wildlife in and around Gunnison County. HCCA has worked on oil, natural gas, and coal bed methane development in Gunnison County for over a decade to prevent irreparable harm to its members' interests. HCCA's members use and plan to continue to live in, use, and enjoy the communities and landscapes, including public lands, affected by the challenged BLM action. HCCA brings this action on its own behalf and on behalf of its adversely affected members.

15. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the CENTER") is a non-profit conservation organization headquartered in Tucson, Arizona, with offices in a number of states and Mexico. The Center has two offices in Colorado, Denver and Crested Butte. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Colorado. The Center has over 61,000 members and 1.5 million members and online activities. The Center's board, staff, and members use public lands in Colorado, including lands that will be affected by the Bull Mountain Unit MDP, for quite recreation, scientific research, aesthetic pursuits, and spiritual renewal.

The Center brings this action on its own behalf and on behalf of its adversely affected members.

16. Plaintiff WILDEARTH GUARDIANS ("GUARDIANS") is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians' has offices in Colorado, Montana, New Mexico, Arizona, Washington, and Oregon. With more than 184,000 members and supporters—including more than 10,000 members and supporters in Colorado— Guardians works to sustain a transition from fossil fuels to clean energy in order to safeguard the West. Guardians has actively engaged in issues related to the federal government's management of public lands and publicly owned fossil fuel minerals throughout the American West, including in the North Fork Valley of western Colorado. The organization and its members have an interest in ensuring that management of public lands and fossil fuels takes into account concerns such as climate change, water and air quality impacts, and cumulative impacts to the western Colorado landscape. Guardians bring this action on its own behalf and on behalf of its adversely affected members.

17. Plaintiffs and their members have concrete and particularized interests in the valley and surrounding landscape of the North Fork of the Gunnison River (hereinafter "North Fork"), which includes the project site's location, and, in particular, the protection of fragile land, wildlands, air, water, habitat, wildlife, and communities impacted by oil and gas development and production.

18. Conservation Groups' members actively and regularly recreate on public lands that the Bull Mountain Unit MDP will impact. Conservation Groups' members derive health, recreational, inspirational, religious, scientific, educational, and aesthetic benefits from their activities in this area. They enjoy hiking, camping, viewing wildlife, photography, and experiencing undeveloped lands within and near the Bull Mountain MDP, including but not limited to, the Raggeds Wilderness Area, the McClure Pass Area, and on the Grand Mesa.

19. Implementation of the Bull Mountain MDP will harm Conservation Groups' members by interfering with their recreational, scientific, and spiritual enjoyment of these lands and their values. The challenged action will lead to increased noise and air pollution, the sights and sounds of industrial activity, truck and heavy equipment traffic, and other impacts, which will undermine their recreational, scientific, and spiritual enjoyment of the area. Through its members, Conservation Groups have an interest in ensuring the Bull Mountain MDP is as environmentally protective as possible and is implemented based on the most informed decisionmaking.

20. The health, aesthetic, recreational, scientific, educational, religious, and procedural interests of Conservation Groups and their members have been adversely affected and irreparably injured by the process BLM used for approving the Bull Mountain MDP and by BLM's decision itself. The adverse impacts that will result from BLM's process and decision threaten actual, imminent, concrete, and particularized harm to Conservation Groups' and their members' interests.

21. Conservation Groups seek relief that will help remedy the injuries Conservation Groups' and their members have suffered. BLM would be required to revisit the challenged Bull Mountain Unit MDP and take action to meaningfully evaluate and prevent or abate significant impacts that would result from their authorization of oil and gas development in this area. The relief sought would redress these injuries.

22. Defendant BUREAU OF LAND MANAGEMENT is an agency within the United States Department of Interior and is the federal agency charged with managing public lands and resources, including federal fluid mineral leases of oil and natural gas, which are at issue here.

23. In this capacity, BLM is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

24. Defendant RYAN ZINKE, U.S. Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior, and in that capacity, has ultimate responsibility for the administration and implementation of NEPA regarding oil and gas related activities involving the Bureau of Land Management.

25. Defendant DANA M. WILSON, is the Acting Southwest District Manager of the Bureau of Land Management, authored the herein challenged ROD approving the Bull Mountain Unit MDP, and, in that official capacity, is responsible for implementing that complying with federal law, including the federal laws implicated by this action.

### IV. STATUTORY AND REGULATORY SCHEME

26. In 1970, NEPA was enacted "to help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect,

restore, and enhance the environment." 40 C.F.R. §1500.1(c). "The policies and goals set forth in [NEPA] are supplementary to those set forth in existing authorizations of Federal agencies." 42 U.S.C. § 4335.

27. Agencies must comply with NEPA before making "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(c)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

28. Recognizing that "each person should enjoy a healthful environment," NEPA ensures that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," among other policies. 42 U.S.C. § 4331(b), (c).

29. NEPA regulations explain, in 40 C.F.R. § 1500.1(c), that:

> Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

30. NEPA is to ensure informed decisionmaking. NEPA sets forth specific procedural requirements federal agencies must follow as they carefully gather and evaluate relevant information about the potential impact of a proposed agency action on the environment. 42 U.S.C. § 4332. NEPA is also to ensure that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking

process thereby guaranteeing that the public is involved in and aware of agency processes. 40 C.F.R. §§1500.1(b); 1500.2(d); 1506.6.

31. NEPA contains "'action-forcing' provisions to make sure that federal agencies act according to the letter and spirit of the Act." 40 C.F.R. § 1500.1(a).

32. These "action-forcing" provisions of NEPA are implemented by the Council on Environmental Quality ("CEQ") regulations through what is known as the "NEPA process," which the CEQ regulations define to "mean[] all measures necessary for compliance with the requirements of section 2 and Title I of NEPA." 40 C.F.R. § 1508.21. CEQ administers NEPA and its implementing regulations, which are binding on all federal agencies. *See* 42 U.S.C. §§ 4342, 4344(3); 40 C.F.R. §§ 1501-08.

33. There are three types of "environmental documentation": (1) an "environmental assessment" ("EA"), 40 C.F.R. § 1508.9; (2) an "environmental impact statement" ("EIS"), 40 C.F.R. § 1508.11; and (3) a "finding of no significant impact" ("FONSI"), 40 C.F.R. § 1508.13. Depending on the significance of the proposed actions' impacts, federal agencies are required to prepare one or more of these three types of environmental documents, along with public review and comment opportunities.

34. Agencies are required to consider, evaluate, and disclose to the public "alternatives" to the proposed action and "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of resources." 42 U.S.C. §§ 4332(2)(C)(iii) & (E); 40 C.F.R. § 1502.14. The evaluation of alternatives must constitute a "substantial treatment," presenting the impacts of the alternatives in comparative form "sharply

defining the issues and providing a clear basis for choice among options by the decisionmaker and public." 40 C.F.R. § 1502.14.

35. An agencies duty to consider "alternatives to the proposed action" is the "heart" of the NEPA process. 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E); 40 C.F.R. § 1502.14(a). Agencies shall evaluate all reasonable alternatives to a proposed action. 40 C.F.R. § 1502.14.

36. Federal agencies are also required to recognize three types of impacts, or effects:

   a. **Direct effects**, which are caused by the action and occur at the same time and place. 40 C.F.R. 1508.8(a) (emphasis added).

   b. **Indirect effects**, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems. 40 C.F.R. § 1508.8(b) (emphases added).

   c. **Cumulative impacts**, which are the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

37. The Administrative Procedure Act ("APA") requires agencies to engage in reasoned decisionmaking based on a fully developed factual record. 5 U.S.C. §§ 701, *et seq*. An APA claim must be asserted to address NEPA violations set forth herein. The APA provides jurisdiction, standards of review, and available relief for persons who challenge a federal action. The APA requires the agency to substantiate its action in a contemporaneously prepared administrative record.

## V.    STATEMENT OF FACTS

38. In 2008 and 2009, BLM provided a 45-day and 57-day scoping period announcing its intention to authorize the Bull Mountain MDP proposed by SG Interests with an Environmental Assessment ("EA").

39. On November 26, 2008, HCCA submitted scoping comments on behalf of itself and another environmental organization on the Bull Mountain proposal.

40. On March 23, 2012, BLM notified the public that a Draft EA was available for a 30-day public comment period.

41. On April 23, 2012, Western Environmental Law Center ("WELC") on behalf of CHC submitted comments on BLM's Draft EA.

42. On April 24, 2012, HCCA submitted comments on behalf of itself and other environmental organizations raising similar concerns to those in the WELC and CHC letter that was submitted the day before.

43. On April 3, 2013, BLM notified the public via *Federal Register* of its intent to prepare and Environmental Impact Statement ("EIS"). BLM's decision to conduct an EIS was the result of public comments that identified that the proposal would have significant

impacts on air quality, greenhouse gas emissions, water quality and supply, threatened, endangered, and sensitive wildlife species, wildlife and wildlife habitat, recreation and visual resources, socioeconomics, and transportation.

44. On February 14, 2014, WELC on behalf and CHC and other environmental organizations submitted Supplemental Comments on the Bull Mountain Unit MDP.

45. On January 16, 2015, BLM and EPA published a Notice of Availability for the Draft EIS in the *Federal Register*, marking the beginning of a 45-day public comment period. On January 27, 2015, the public comment period was extended another 45-days.

46. On April 16, 2015, WELC, on behalf of CHC, HCCA, Guardians, and a number of other conservation organizations, submitted comments raising concerns that included but were not limited to, the need for BLM to issue a moratorium on all oil and gas development in the Uncompahgre Field Office pending the Office's ongoing revision of its Resource Management Plan ("RMP"), BLM had failed to consider all reasonable alternative and to take a hard look at direct, indirect, and cumulative impacts, including for resources such as air quality, climate change, resource impacts from hydraulic fracturing, water quality and quantity, soils, wildlife and their habitat, and failure to consider a reasonable range of alternatives.

47. On July 8, 2016, BLM and EPA published a Notice of Availability for the Final EIS in the *Federal Register*, marking the beginning of a 30-day review period.

48. On August 8, 2016, WELC on behalf of CHC, HCCA, Guardians, and other environmental organizations submitted comments in response to the Notice of Availability for the Final EIS referred to in the preceding paragraph.

49. On August 8, 2016, the Center also submitted comments in response to this Notice of Availability for the challenged project.

50. These August 8, 2016 comments re-iterated concerns raised in previous public comment periods including, but not limited to, BLM's continued failure to consider all reasonable alternative and to take a hard look at direct, indirect, and cumulative impacts, including for resources such as air quality, climate change, resource impacts from hydraulic fracturing, water quality and quantity, soils, wildlife and their habitat.

51. Over a year later, on October 4, 2017, BLM published notice in the *Federal Register* that the ROD approving the Bull Mountain MDP was available and has been signed. Dana M. Wilson, in her official capacity, signed the ROD.

52. The ROD approved BLM's Selected Alternative in its Final EIS for the Bull Mountain Unit MDP, approving up to 33 new well pads, exploration and development of up to 146 natural gas wells, four waste-water disposal wells, and associated infrastructure on Federal and private minerals leases within the Bull Mountain Unit. The approval included a new well pad and well for the 12-89-7-1 APD.

53. The Bull Mountain Unit is located within the Colorado River basin, approximately 30 miles northeast of the Town of Paonia.

54. The Unit's boundaries encompass approximately 19,670 acres of Federal and private oil and gas mineral estate in Gunnison County, Colorado. The unit consists of 440

acres of BLM Federal surface lands and subsurface mineral estate; 12,900 acres of split-estate consisting of private surface and Federal mineral estate the BLM administers; and 6,330 acres of fee land consisting of private surface and private mineral estate.

55. The Unit is bisected by State Highway 133, the only paved roadway within the project area.

56. The life of any individual well is in the Bull Mountain Unit MDP is estimated to be 40 years; this includes the coal bed natural gas, shale gas, and water disposal wells, although actual protection years could vary by individual wells.

57.  BLM assumed that the analysis horizon for the project would be 50 years.

58. BLM's Draft EIS identified three potential alternatives. These alternatives included a No Action Alternative (Alternative A) and two Action Alternatives (Alternative B and C).

59. BLM determined Alternative A did not respond to the purpose and need of the proposed action, would result in only 11 new well pads on private mineral estate, 55 new gas wells, 1 new water disposal well, and drilling would last 3 years.

60. For Alternative B, there would be 36 new well pads on Federal mineral estate, 146 new gas wells, 4 new water disposal wells, and drilling would last 6 years.

61. For Alternative C, there would be 35 new well pads on Federal mineral estate, 146 new gas wells, 4 new water disposal wells, and drilling would also last for 6 years.

62. Alternatives B and C only considered development on the federal mineral estate.

63. BLM's Final EIS identified four potential alternatives, adding another action alternative labeled Alternative D.

64. Alternative A was still stated as not responsive to the purpose and need of the proposed action, would result in 10 new well pads on private mineral estate, 55 new gas wells, 1 new water disposal well, and drilling would last 3 years.

65. For Alternative B, there would be 36 new well pads on Federal mineral estate, including the 12-89-7-1 APD, 146 new gas wells, including the 12-89-7-1 APD, 4 new water disposal wells, and drilling would last 6 years.

66. For Alternative C, there would be 35 new well pads on Federal mineral estate, including the 12-89-7-1 APD, 146 new gas wells, including the 12-89-7-1 APD, 4 new water disposal wells, and drilling would last 6 years.

67. For Alternative D, there would be 33 new well pads on Federal mineral estate, including the 12-89-7-1 APD, 146 new gas wells, including the 12-89-7-1 APD, 4 new water disposal wells, and drilling would last 6 years.

68. BLM identified Alternative D as its preferred alternative.

69. The expected duration of the Bull Mountain Unit MDP field is to be 50 years and has potential to last for 100 years.

70. BLM's Alternative D cumulative impacts for water quality and quantity was limited to a duration of no more than a ten year period, and in some instances limited to a shorter period. BLM's Alternative D cumulative impacts analysis from drilling, hydraulic fracturing, and disposal of production wastewater concluded that groundwater impacts

were not expected to be significant. BLM stated this was because impacts were minimal for any given well.

71. BLM's analysis for elk and mule deer also did not look at impacts over the entire life of the Bull Mountain Unit MDP. BLM's analysis relied heavily on voluntary measures, of which were expected to be implemented through the construction phase of the proposed project. BLM's impact of increased traffic impacts on these ungulates did not include expected increased traffic on State Highway 133.

72. U.S. Fish & Wildlife Service considers any net water depletion that could decrease stream flows to have direct and/or indirect impact on four Colorado River endangered fish species. All alternatives, including Alternative A, therefore may affect, and are likely to adversely affect the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub.

73. BLM contemplates that capturing potential contaminant at the Paonia Reservoir would minimize impacts on Colorado River fish as a result of hazardous spills or sediment releases. BLM did not factor the water depletion affect such spills or sediment releases would have on these four species.

74. BLM states that current and future water depletions would continue to threaten Colorado River endangered fish species. BLM did not analyze direct, indirect, and cumulative impacts on these species spanning the entire life of the project.

## IV. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Failure to Analyze a Reasonable Range of Alternatives:** *BLM arbitrarily and capriciously failed to consider all reasonable alternatives.*

75. Conservation Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

76. BLM violated NEPA in preparing, issuing, and approving the Bull Mountain Unit MDP without consideration of all reasonable alternatives. 42 U.S.C. §§4332(2)(C)(iii) & (E); 40 C.F.R. §1502.14.

77. BLM did not consider, evaluate, and disclose all reasonable alternatives as NEPA requires. BLM's analysis dismissed the No Action Alternative for not meeting the purpose and need. BLM did not consider and incorporate diverse resource-protective alternatives, alternatives recognizing a baseline of development on private lands and minerals, or alternatives considering phased or reduced development, as NEPA requires.

78. BLM's failure to consider a reasonable range of alternatives is in violation of NEPA and NEPA's implementing regulations. This constitutes arbitrary and capricious agency action, an abuse of discretion, and action without observance of procedures required by law, pursuant to the APA, 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**
**Failure to Take a Hard Look at Cumulative Impacts of the Bull Mountain MDP:**
*BLM acted arbitrarily and capriciously by failing to take a hard look at cumulative impacts to resources.*

79. Conservation Groups repeat and incorporate by reference the allegations in all paragraphs of this Complaint.

80. BLM must comply with NEPA's mandate that before making "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(c)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

81. NEPA imposes action-forcing procedures that require agencies to take a hard look at environmental consequences. These environmental consequences may be direct, indirect, or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

82. BLM must consider cumulative impacts. 40 C.F.R. § 1508.7. Cumulative impacts are those that result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. *Id*. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Id*.

83. BLM's cumulative impacts analysis failed to consider resource impacts over the entire life of the Bull Mountain Unit MDP and from all other reasonably foreseeable actions within the region.

84. BLM's cumulative analysis of resource impacts relied heavily on voluntary mitigation measures, of which BLM expects to be implemented through the construction phase of the proposed project. BLM did not provide analysis of the impacts over the life of the project with and/or without such mitigation measures, and with other foreseeable development in the region. BLM's cumulative impact analysis did not include expected increased traffic on State Highway 133, contemplate water depletion impacts on wildlife, fish species and other resources, or air quality and greenhouse gas emissions impacts, together with other foreseeable development in the region.

85. BLM did not comply with the "hard look" requirements under NEPA and its implementing regulations before approving the action challenged herein.

86. BLM's violations constitute arbitrary and capricious agency action, an abuse of discretion, and action without observance of procedures required by law, pursuant to the APA. 5 U.S.C. § 706(2).

### IV. REQUEST FOR RELIEF

FOR THESE REASONS, Conservation Groups respectfully requests that this Court enter judgment providing the following relief:

A. Declare that Defendant violated NEPA and APA, when approving the Bull Mountain Unit MDP;

B. Declare that Defendant violated NEPA and APA when approving the 12-89-7-1 APD on federally leased minerals;

C. Vacate each and every agency action taken in reliance on the Bull Mountain Unit MDP Final EIS/ROD, including the approval of the 12-89-7-1 APD, for violations of NEPA;

D.  Remand this matter to BLM for further action in accordance with applicable laws;

E.  Administratively close the case and provide a means for Citizen Groups to enforce the judgment until such time as the necessary NEPA processes are completed in accordance with the requirements of NEPA, APA, and other applicable requirements;

F.  In the alternative, direct by permanent injunction that Defendants issue all necessary action to prohibit implementation of the Bull Mountain Unit MDP Final EIS/ROD until adequate and appropriate NEPA process and substantive approvals have been completed for any such proposed action;

G.  In the alternative, direct by permanent injunction that BLM take all the necessary steps to avoid further impacts to water quality and quantity, wildlife, and public lands that may be impacted by the challenged action;

H.  Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and,

I.  Grant Plaintiffs' such additional and further relief as the Court may deem just and proper.


RESPECTFULLY SUBMITTED this 20th day of October, 2017,

/s/ Kyle J. Tisdel
Kyle J. Tisdel, CO Bar No. 42098
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, New Mexico  87571
(575) 613-8050
tisdel@westernlaw.org

/s/ Allison Melton
Allison N. Melton, CO Bar No. 45088
Center for Biological Diversity
P.O. Box 3024

Crested Butte, CO 81224
(970) 309-2008
amelton@biologicaldiversity.org

*Counsel for Plaintiffs*

**Plaintiffs' Address**
Citizens for a Healthy Community
P.O. Box 291
Hotchkiss, Colorado  81419

High Country Conservation Advocates
P.O. Box 1066
Crested Butte, CO  81224

Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO  80202

WildEarth Guardians
2590 Walnut St.
Denver, CO  80205