**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-2519-LTB-GPG


CITIZENS FOR A HEALTHY COMMUNITY;
HIGH COUNTRY CONSERVATION ADVOCATES;
CENTER FOR BIOLOGICAL DIVERSITY;
WILDEARTH GUARDIANS, and
WILDERNESS WORKSHOP;

   Plaintiffs,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the U. S. Department of
Interior;
RYAN ZINKE, in his official capacity as U.S. Secretary of the Interior;
DANA M. WILSON, in her official capacity as Acting Southwest District Manager;
UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture;
SONNY PERDUE, in his official capacity as U.S. Secretary of Agriculture; and
SCOTT G. ARMENTROUT, in his official capacity as Forest Supervisor;

   Federal Defendants,

   and

SG INTERESTS VII. LTD., and
SG INTERESTS I, LTD.,

   Defendant-Intervenors.
_____

**PLAINTIFFS' OPENING MERITS BRIEF**
_____

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATUTORY BACKGROUND ................................................................................... 2

    I.    Mineral Leasing Act ....................................................................................... 2

    II.   National Environmental Policy Act ............................................................ 3

STANDARD OF REVIEW ........................................................................................... 4

STANDING ..................................................................................................................... 4

STATEMENT OF FACTS ............................................................................................ 6

    I.    BLM'S OIL AND GAS PLANNING AND MANAGEMENT FRAMEWORK ............. 6

    II.   FOREST SERVICE MANAGEMENT OF SPLIT ESTATE LANDS ............................. 8

    III.  BACKGROUND ON THE BULL MOUNTAIN MDP AND 25-WELL PROJECT ........ 9

ARGUMENT .................................................................................................................. 11

    I.    BLM AND USFS FAILED TO CONSIDER A REASONABLE RANGE OF
         ALTERNATIVES ......................................................................................... 11

    II.   BLM AND USFS FAILED TO TAKE A HARD LOOK AT DIRECT,
         INDIRECT, AND CUMULATIVE IMPACTS TO PEOPLE AND THE
         ENVIRONMENT ......................................................................................... 15

        A. BLM and USFS Failed to Take a Hard Look at Greenhouse Gas Pollution and
           Climate Change ......................................................................................... 16

        B. BLM and USFS Failed to Take a "Hard Look" at the Impacts of Hydraulic
           Fracturing on Water Resources and Human Health. ............................... 28

        C. BLM and USFS Failed to Take a Hard Look at Cumulative Impacts of the Project
           to Specific Resources. ............................................................................... 32

CONCLUSION ............................................................................................................... 41

## TABLE OF AUTHORITIES

**Cases**

*All Indian Pueblo Council v. U.S.*,
   975 F.2d 1437 (10th Cir. 1992) ............................................................... 13

*Animal Def. Council v. Hodel*,
   840 F.2d 1432 ......................................................................................... 26

*Balt. Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983) ................................................................................. 15

*Border Power Plant v. Dep't of Energy*,
   260 F. Supp. 2d 997 (S.D. Cal. 2003) .................................................... 19

*Calvert Cliffs v. Atomic Energy Comm'n*,
   449 F.2d 1109 (D.C. Cir. 1971) ............................................................. 26

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971) ................................................................................. 4

*Citizens' Committee to Save Our Canyons v. U.S. Forest Serv.*,
   297 F.3d 1012 (10th Cir. 2009) ............................................................. 29

*City of Davis v. Coleman*,
   521 F.2d 661 (9th Cir. 1975) ................................................................. 28

*Coal. for Responsible Reg., Inc. v. EPA*,
   684 F.3d 102 (D.C. Cir. 2012) .............................................................. 16

*Colo. Envtl. Coal. v. Dombeck*,
   185 F.3d 1162 (10th Cir. 1999) ............................................................. 13

*Colorado Envtl. Coal. v. Salazar*,
   875 F. Supp. 2d 1233 (D. Colo. 2012) .................................................. 36

*Comm. to Preserve Boomer Lake Park v. Dep't of Transp.*,
   4 F.3d 1543 (10th Cir. 1993) ................................................................. 40

*Comm. to Save Rio Hondo v. Lucero*,
   102 F.3d 445 (10th Cir. 1996) ............................................................. 5,6

*Ctr. for Biological Diversity v. NHTSA*,
   538 F.3d 1172 (9th Cir. 2008) .......................................................... 20,25

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) ......................................................... 11,15

*Del. Riverkeeper Network v. FERC*,
   753 F.3d 1304 (D.C. Cir. 2014) ............................................................. 23

*Diné CARE v. OSMRE*,
   82 F. Supp. 3d 1201 (D. Colo. 2015) ...................................................... 18

*Forest Guardians v. U.S. Fish & Wildlife Serv.*,
   611 F.3d 692 (10th Cir. 2010) ................................................................ 15

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................................. 5

*Fuel Safe Wash. v. FERC*,
   389 F.3d 1313 (10th Cir. 2004) .............................................................. 11

*Grand Canyon Trust v. FAA*,
   290 F.3d 339, 345 (D.C. Cir. 2002) ............................................... 20,21,22

*High Country Conserv. Advocates v. U.S. Forest Serv.*,
   52 F. Supp. 3d 1174 (D. Colo. 2014) ............................................... passim

*Hillsdale Envtl. Loss Prevention v. Army Corps of Eng'rs*,
   702 F.3d 1156 (10th Cir. 2012) .............................................................. 15

*Hughes River Watershed Conservancy v. Glickman*,
   81 F.3d 437 (4th Cir. 1996) .................................................................... 25

*Idaho Sporting Cong. v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) .................................................................. 40

*Johnston v. Davis*,
   698 F.2d 1088 (10th Cir. 1983) .............................................................. 25

*Kern v. BLM*, ,
   284 F.3d 1062 (9th Cir. 2002) ......................................................... passim

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ............................................................................... 40

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 6

*Manygoats v. Kleppe*,
   558 F.2d 556 (10th Cir. 1977) ................................................................ 33

*Marsh v. ONRC*,
   490 U.S. 360 (1989) ................................................................................. 3

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015) ............................................................. 26

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
   345 F.3d 520 (8th Cir. 2003) .................................................... 18

*Middle Rio Grande Conserv. Dist. v. Norton*,
   294 F.3d 1220 (10th Cir. 2002) ................................................. 29

*Mont. Envtl. Info. Ctr. v. U.S. OSMRE*,
   274 F. Supp. 3d 1074 (D. Mont. 2017) ............................. 18,25,26

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) ................................................................... 22

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) .................................................... 22

*N. Cheyenne Tribe v. Norton*,
   503 F.3d 836 (9th Cir. 2007) .................................................... 12

*N. M. ex rel. Richardson v. BLM*,
   565 F.3d 683 (10th Cir. 2009) ............................................... 7,16

*Nat'l Parks Conservation Ass'n v. EPA*,
   788 F.3d 1134 (9th Cir. 2015) .................................................. 37

*National Parks & Conservation v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001) .................................................... 32

*Native Ecosystems Council v. U.S. Forest Serv.*,
   418 F.3d 953 (9th Cir. 2005) ............................................... 34,35

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
   137 F.3d 1372 (9th Cir. 1998) .................................................. 20

*NRDC v. U.S. Forest Serv.*,
   421 F.3d 797 (9th Cir. 2005) .................................................... 26

*Olenhouse v. Commodity Credit Corp.*,
   42 F.3d 1560 (10th Cir. 1994) .................................................... 4

*Or. Natural Desert Ass'n v. Jewell*,
   840 F.3d 562–70 (9th Cir. 2016) .............................................. 36

*Pennaco Energy, Inc. v. DOI*,
   377 F.3d 1147 (10th Cir. 2004) .................................................. 7

*Public Lands Council v. Babbitt*,
   167 F.3d 1287 (10th Cir. 1999) ................................................................. 14

*Robertson v. Methow* Valley,
   490 U.S. 332 (1989) ............................................................................. 15,17

*S. Utah Wilderness Alliance v. Palma*,
   707 F.3d 1143 (10th Cir. 2013) ................................................................. 4

*San Juan Citizens Alliance v. Bureau of Land Mgmt.*,
   16-cv-0376-MCA-JHR, 2018 WL 2994406 (D.N.M. June 14, 2018)..................... passim

*Save Our Ecosystems v. Clark*,
   747 F.2d 1240 n.9 (9th Cir. 1984) ............................................................. 27

*Scientists' Inst. For Pub. Info. V. Atomic Energy Comm'n*,
   481 F.2d 1079 (D.C. Cir. 1973) ................................................................ 23

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) ............................................................. 19,23

*Sierra Club v. Hodel*,
   848 F.2d 1068 (10th Cir. 1988) ................................................................. 16

*Sierra Club v. Marsh*,
   976 F.2d 763 (1st Cir.1992) ...................................................................... 15

*Sierra Club v. Morton*,
   510 F.2d 813 (5th Cir. 1975) .................................................................... 23

*Sierra Club v. Sigler*,
   695 F.2d 957 (5th Cir. 1983) ................................................................. 25,26

*South Fork Band Council of Western Shoshone of Nevada v. Dep't of Interior*,
   588 F.3d 718 (9th Cir. 2009) .................................................................... 35

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
   608 F.3d 592 (9th Cir. 2010) .................................................................... 33

*TOMAC v. Norton*,
   433 F.3d 852 (D.C. Cir. 2006) .................................................................. 22

*W. Org. of Resource Councils v. Bureau of Land Mgmt.*,
   No. 16-cv-0021-GF-BMM, 2018 WL 1475470 (D. Mont. March 23, 2018) .......... 19

*Westlands Water Dist. v. U.S. DOI*,
   376 F.3d 853 (9th Cir. 2004) .................................................................... 13

*WildEarth Guardians v. OSMRE,*
    104 F. Supp. 3d 1208 (D. Colo. 2015) ..................................................... 18

*Wyoming v. USDA,*
    661 F.3d 1209 (10th Cir. 2011) ............................................................. 17

*Wyoming Outdoor Council v. Army Corps of Eng'rs,*
    351 F. Supp. 2d 1232 (D. Wyo. 2005) ................................................ 33,38

*Zero Zone v. Dep't of Energy,*
    832 F.3d 654 (7th Cir. 2016) ................................................................ 27

**Statutes**

5 U.S.C. § 706 ............................................................................................ 4

16 U.S.C. § 475 .......................................................................................... 13

16 U.S.C. § 528 .......................................................................................... 13

30 U.S.C. § 187 ............................................................................................ 2

30 U.S.C. § 226 ............................................................................................ 2

30 U.S.C. §§ 181 *et seq.* ............................................................................. 2

42 U.S.C. § 4321 .......................................................................................... 3

42 U.S.C. § 4331............................................................................................ 3,14

42 U.S.C. § 4332 ................................................................................... passim

43 U.S.C. § 1701 ................................................................................... passim

43 U.S.C. § 1712 ..................................................................................... 7,8,12

43 U.S.C. § 1732 .................................................................................... 8,12,13

**Rules and Regulations**

36 C.F.R. § 228.106 ...................................................................................... 8

36 C.F.R. § 228.107 ..................................................................................... 8,9

40 C.F.R. § 1500.1 ............................................................................... passim

40 C.F.R. § 1500.2 ....................................................................................... 4

40 C.F.R. § 1501.2 ..................................................................................... 3,16

40 C.F.R. § 1502.14 ................................................................................................ 4,11,24

40 C.F.R. § 1502.16 ................................................................................................ passim

40 C.F.R. § 1502.22 ................................................................................................ passim

40 C.F.R. § 1502.23 ................................................................................................ 25

40 C.F.R. § 1508.7 ................................................................................................. passim

40 C.F.R. § 1508.8 ................................................................................................. passim

40 C.F.R. § 1508.9 ................................................................................................. 11

40 C.F.R. § 1508.27 ............................................................................................... passim

43 C.F.R. § 1600 *et seq.* ...................................................................................... 7

43 C.F.R. § 1601.0-5 ............................................................................................. 7

43 C.F.R. § 1701 *et seq.* ...................................................................................... passim

43 C.F.R. § 3101.1-2 ............................................................................................. passim

43 C.F.R. § 3101.1-3 ............................................................................................. 7

43 C.F.R. § 3120 *et seq.* ...................................................................................... 7

43 C.F.R. §§ 3160.0-4 ........................................................................................... 7

43 C.F.R. § 3162.3-1 ............................................................................................. 7,9

46 Fed. Reg. 18,026 (March 23, 1981) ............................................................... 14

72 Fed. Reg. 10,308 (Mar. 7, 2007) .................................................................... 8

81 Fed. Reg. 51,866 (Aug. 5, 2016) .................................................................... 18

82 Fed. Reg. 16,576 (April 5, 2017) .................................................................... 18

**Other**

BLM's Land Use Planning Handbook (H-1601-1) ............................................. 7

Federal Rules of Evidence 201(b)(2), (c) .......................................................... 18

Final Guidance for Federal Departments and Agencies on Consideration of
    Greenhouse Gas Emissions and the Effects of Climate Change in
    National Environmental Policy Act Reviews (CEQ Final Guidance) ............... 18

GAO-11-35, *Energy-Water Nexus* (October 2010) .......................................................... 38

GAO-14-663, *Social Cost of Carbon* (July 24, 2014) .................................................... 27

Sec. Order 3289 ........................................................................................................... 23

## INTRODUCTION

Plaintiffs Citizens for a Healthy Community, High Country Conservation Advocates, Center for Biological Diversity, WildEarth Guardians, and Wilderness Workshop ("Conservation Groups") challenge two projects that together involve 175 oil and gas wells in the North Fork Valley, on the western slope of Colorado's Rocky Mountains. Conservation Groups respectfully request the Court set aside Federal Defendants' approval of the 150-well Bull Mountain Master Development Plan ("MDP") and the 25-well Project (collectively, the "Projects"), as well as the agency's implementation of those Projects by approving applications for permits to drill ("APDs") individual wells.

The North Fork Valley is home to the largest concentration of organic and chemical-free farms within the State of Colorado, and is one of two American Viticulture Areas in the State. North Fork Valley farmers, ranchers, orchardists, and winemakers, as well as the robust outdoor recreation industry, are building a strong and resilient local economy by using its resources wisely, conserving its soil, and valuing its water and air. The bucolic valley is also home to wildlife, including mule deer and elk. These iconic ungulates use areas within and adjacent to the Bull Mountain MDP and 25-well Project as winter refuges, including during the most severe winters.

The North Fork Valley also includes oil and gas resources. Because oil and gas development has intensive impacts, it is the dominant use where it occurs. Oil and gas development fragments the landscape with roads, industrial traffic, pipelines, drill pads, and wastewater pits, causing lasting impacts on public health, communities, businesses, wildlife, air and water, and climate.

The Bull Mountain MDP Environmental Impact Statement ("EIS") and the 25-well Project Environmental Assessment ("EA") (collectively "Projects"), completed pursuant to the Federal Defendants' obligations under the National Environmental Policy Act ("NEPA"), contain serious flaws, reflecting the Bureau of Land Management ("BLM") and U.S. Forest Service's ("USFS") prioritization of oil and gas above public health and the area's other uses and spectacular values. Although the right to develop an oil and gas lease becomes vested once a lease is issued, the agencies' approval of such development must still comply with federal law. Specifically, Federal Defendants' decision to approve the Projects was arbitrary and capricious. Federal Defendants violated NEPA by failing to analyze a reasonable range of alternatives, and by failing to take a hard look at direct, indirect, and cumulative impacts, including the severity and impacts of greenhouse gas pollution and the impacts of hydraulic fracturing. These failures made it impossible for BLM to engage in effective decisionmaking that would protect resource values, the climate, and human health.

## STATUTORY BACKGROUND

### I.      Mineral Leasing Act

Under the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181 *et seq.,* as amended, the Secretary of the Interior is responsible for managing and overseeing mineral development on public lands, not only to ensure safe and fair development of the mineral resource, but also to "safeguard[]…the public welfare." 30 U.S.C. § 187. The Secretary has discretion, though constrained by the laws at issue in this case, to determine where, when, and under what terms and conditions mineral development should occur. 43 C.F.R. §§ 3101.1-2; 30 U.S.C. § 226(a). The grant of rights in a federal mineral lease is subject to a number of reservations of authority to

the federal government, including reasonable measures concerning the timing, pace, and scale of development. *Id.*

## II.      National Environmental Policy Act

NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1. It is NEPA's purpose, in part, "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. NEPA was enacted with the recognition that "each person should enjoy a healthful environment," to ensure that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," among other policies. *Id.* § 4331(b), (c).

"Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2; *see also Marsh v. ONRC*, 490 U.S. 360, 371 (1989) (EIS "permits the public and other government agencies to react to the effects of a proposed action at a meaningful time"). To accomplish this purpose, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an EIS, must, among other things, describe the "environmental impact of the proposed action," and evaluate alternatives to the proposal. *Id.*

NEPA also requires the agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts

3

concerning alternative uses of available resources." *Id*. § 4332(2)(E). Alternatives are the "heart" of the NEPA process, ensuring that agencies "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

NEPA regulations explain, at 40 C.F.R. §1500.1(c), that:

> Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

Regulations also direct that BLM to the fullest extent possible "encourage and facilitate public involvement" in the NEPA process. *Id*. § 1500.2(d).

## STANDARD OF REVIEW

Agency compliance with NEPA is judicially reviewed pursuant to the Administrative Procedure Act, 5 U.S.C. § 706. An agency's decision pursuant to NEPA is "set aside if it fails to meet statutory, procedural or constitutional requirements or if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413, n.30 (1971)). "These standards require the reviewing court to engage in a substantial inquiry…. An agency's decision is entitled to a presumption of regularity, but that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." *Id.* at 1574.

## STANDING

Conservation Groups have standing to bring this action. Standing requires a showing of injury, traceability, and redressability. *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013). An organization has standing "when its members would otherwise have

standing to sue in their own right, the interests at stake are germane to the organization's

purpose, and neither the claim asserted nor the relief requested requires the participation of

individual members in the lawsuit." *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*,

528 U.S. 167, 181 (2000). A plaintiff's members' "reasonable concerns" of harm caused by the

defendant's activity directly affecting those affiants' recreational, aesthetic, and economic

interests establishes injury-in-fact. *Id*. at 183-84. "Under [NEPA], an injury results not from the

agency's decision, but from the agency's *uninformed* decisionmaking." *Comm. to Save Rio

Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996).

      Here, Conservation Groups meet this standard. Conservation Groups' members are

directly harmed by BLM's failure to comply with NEPA in authorizing the Projects.

Conservation Groups' members live, work, and recreate in the planning area, with interests that

are bound to the land, air, creeks and rivers, habitat, wildlife, and other components of healthy,

intact landscapes—all of which are threatened by impacts associated with oil and gas

development from the Projects.[1] Conservation Groups' members' activities and enjoyment of the

planning areas are both personal and professional, and include hiking, hunting, camping, skiing,

aesthetic enjoyment, spiritual contemplation, and other vocational, scientific, and recreational

activities.[2] Having already witnessed the impact that current oil and gas development can have

on the landscape, Conservation Groups' members identify ongoing injuries to their use and

---

[1] *See* Ewert Decl. ¶¶ 1, 5-8 (Exhibit 1); Hart Decl. ¶¶ 11-21 (Exhibit 2); Drake Decl. ¶¶ 6-9, 11-23 (Exhibit 3); Nichols Decl. ¶¶ 8-14 (Exhibit 4); Reed Decl. ¶¶ 2-8 (Exhibit 5).
[2] *See* Ewert Decl.¶¶ 1, 6-8; Hart Decl. ¶¶ 3, 7, 11-18; Drake Decl. ¶¶ 7-8, 11, 17; Nichols Decl. ¶¶ 9-12; Reed Decl. ¶¶ 2-3, 5.

enjoyment of the planning area, as well as injuries and increased concerns from threats to their health and safety.[3]

Conservation Groups' members' injuries can be traced to the agencies' decisions to authorize the Projects without taking a hard look at impacts and all reasonable alternatives under NEPA, which increases the likelihood of environmental, recreational, aesthetic, and health-related injuries to Conservation Groups and their members from negative impacts to air, water, landscapes, and climate due to oil and gas leasing and development associated with the Projects.

Conservation Groups' members' injuries would be redressed by a favorable result in this case because BLM and USFS would be required to sufficiently analyze the direct, indirect, and cumulative impacts of oil and gas development from the Projects on the environment and human health. Such analysis is fundamental to NEPA's role in agency decisionmaking, and could lead to the application of additional measures or development strategies (such as phased development) that would lessen the potential impacts to people and the environment. "Under [NEPA], 'the normal standards of redressability' are relaxed; a plaintiff need not establish that the ultimate agency decision would change upon [NEPA] compliance." *Comm. to Save Rio Hondo*, 102 F.3d at 452 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).

## STATEMENT OF FACTS

### I.   BLM'S OIL AND GAS PLANNING AND MANAGEMENT FRAMEWORK

BLM is the federal agency tasked with the management of onshore oil and gas (a.k.a. "fluid minerals") leasing and development through a three-phase process of planning, leasing, and drilling. Each phase serves a distinct purpose, and is subject to unique rules, policies, and procedures, though the three phases, ultimately, must ensure "orderly and efficient"

---

[3] *See* Ewert Decl. ¶¶ 7-8; Hart Decl. ¶¶ 19-21; Drake Decl. ¶¶ 9-11, 13-24; Nichols Decl. ¶¶ 8, 13-14; Reed Decl. ¶ 7.

development. 43 C.F.R. §§ 3160.0-4. Oil and gas development is a multiple use managed in

accordance with the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701

*et seq*. FLPMA, in 43 U.S.C. § 1701(a)(8), provides that BLM must manage the public lands:

> [I]n a manner that will protect the quality of scientific, scenic, historical,
> ecological, environmental, air and atmospheric, water resource, and archeological
> values; that, where appropriate, will preserve and protect certain public lands in
> their natural condition; that will provide food and habitat for fish and wildlife and
> domestic animals; and that will provide for outdoor recreation and human
> occupancy and use.

In the first phase of oil and gas decisionmaking, BLM develops a macro-level Resource

Management Plan ("RMP") in accordance with FLPMA, NEPA, and associated planning

regulations, 43 C.F.R. §§ 1600 *et seq*., with additional guidance from BLM's Land Use Planning

Handbook (H-1601-1). The RMP determines broadly where oil and gas development may occur

in a Field Office and how it will be managed. *See* 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0-5(n).

In the second phase of oil and gas decisionmaking, BLM accepts the nomination of lease

parcels from the lands made available for mineral leasing through the RMP, and sells oil and gas

development rights for particular lands in accordance with 43 C.F.R. §§ 3120 *et seq*. Prior to a

BLM lease sale, the agency has the authority to subject leases to terms and conditions, which can

serve as "stipulations" to protect the environment. 43 C.F.R. § 3101.1-3. Oil and gas leases

confer "the right to use so much of the leased lands as is necessary to explore for, drill for, mine,

extract, remove and dispose of all the leased resource in a leasehold." 43 C.F.R. § 3101.1-2.

The third phase occurs when companies that have purchased oil and gas leases apply for

and obtain permits to drill specific wells in compliance with the RMP. *Pennaco Energy, Inc. v.*

*DOI*, 377 F.3d 1147, 1151-52 (10th Cir. 2004); 43 C.F.R. § 3162.3-1(c). BLM must conduct a

site-specific NEPA analysis of the reasonably foreseeable impacts of that drilling. *N. M. ex rel.*

*Richardson v. BLM*, 565 F.3d 683, 717-18 (10th Cir. 2009); *see also Pennaco*, 377 F.3d at 1160.

Rather than preparing a separate NEPA analysis for each individual APD, BLM often conducts site-specific NEPA for projects involving multiple wells. *See* 72 Fed. Reg. 10,308, 10,335 (Mar. 7, 2007) (Onshore Oil and Gas Order No. 1 discussing master development plans). The 150-well Bull Mountain MDP and the 25-well Project at issue in this litigation involve this type of project-level analysis. While lessees have the guaranteed right to develop oil and gas in the leasehold once a lease is issued, that right is "subject to" BLM's direct oversight of lease operations and BLM's retained authorities to fulfill FLPMA's multiple use mandate through the protection of non-mineral multiple uses such as "air and atmospheric" values; to balance resource use and impacts with resource protection through resource management planning; and, "by regulation or otherwise," to "take any action necessary prevent unnecessary or undue degradation of the lands." 43 U.S.C. §§ 1701(a)(8), 1712, 1732(b). Accordingly, BLM retains the authority to limit development, reduce the number of wells that can be drilled, or impose Conditions of Approval ("COAs") and mitigation requirements that reduce impacts. The scope of such "reasonable measures" is delimited by the lease and the lessees' surface use rights. *See id.*; 43 C.F.R. § 3101.1-2.

## II.  FOREST SERVICE MANAGEMENT OF SPLIT ESTATE LANDS

The Forest Service's NEPA obligations extend to proposals for oil and gas development on Forest Service land. 36 C.F.R. § 228.107(a). Although BLM is charged with management of federal oil and gas resources, as described above, when oil and gas development is proposed on Forest Service land the USFS is required to review a surface use plan of operations ("SUPO") for the proposed development. 36 C.F.R. § 228.106(a). A SUPO contains information regarding "road and drillpad location, details of pad construction, methods for containment and disposal of waste material, plans for reclamation of the surface," and other pertinent information about the

extent and nature of the proposed development. 43 C.F.R. §§ 3162.3-1(d)(1), (f).

The USFS must analyze the SUPO pursuant to NEPA and decide whether there will or may be significant effects necessitating the preparation of an EIS, or if there is uncertainty, an EA. 36 C.F.R. § 228.107(a).

## III.     BACKGROUND ON THE BULL MOUNTAIN MDP AND 25-WELL PROJECT

*Bull Mountain Master Development Plan*. The Bull Mountain Unit is located within the Colorado River basin, approximately 30 miles north of the Town of Paonia. AR-UNC27453. The Unit's boundaries encompass approximately 19,670 acres of Federal and private oil and gas mineral estate in Gunnison County, Colorado. AR-UNC27470. The unit consists of 440 acres of BLM Federal surface lands and subsurface mineral estate; 12,900 acres of split-estate consisting of private surface and Federal mineral estate the BLM administers; and 6,330 acres of fee land consisting of private surface and private mineral estate. *Id.* State Highway 133, a Colorado Scenic Byway known as the West Elk Loop, bisects the Unit. AR-UNC27759. It is the only paved roadway within the project area. AR-UNC27762.

In 2008, BLM announced its intention to authorize the Bull Mountain MDP, proposed by SG Interests, with an EA. AR-UNC55338. On March 23, 2012, BLM released a preliminary EA for public comment. AR-UNC78547. In response to public comments, BLM determined that an EIS was necessary "due to projected air quality impacts," and identified additional issues with the proposal for water quality and supply, and wildlife, among other resources, in the North Fork Valley. AR-UNC55344-45. A Draft EIS was made available to the public on January 16, 2015, AR-UNC5710; a Final EIS was made available to the public on July 8, 2016, AR-UNC42302; and a signed Record of Decision ("ROD") approving the Bull Mountain MDP was made available to the public on October 4, 2017. AR-UNC42637.

BLM considered four alternatives in the Bull Mountain EIS: a no action alternative (A) and three action alternatives (B, C, and D). Each action alternative considered the same development of 146 new gas wells and 4 wastewater wells. The only variation was the number of well pads, which was 36, 35, and 33 respectively. AR-UNC27457. BLM identified Alternative D as its preferred alternative (146 gas wells on 33 well pads, and 4 wastewater wells), which was approved through the ROD. *Id.; see also* AR-UNC42637; AR-UNC42461, AR-UNC42509. The expected production duration of the Bull Mountain MDP field is 50 years, but future technological advances may extend the life of the project beyond 50 years. AR-UNC27501.

*25-well Project*. The 25-well Project area is also located within the Colorado River basin approximately 30 miles north of the Town of Paonia and directly adjacent to the Bull Mountain MDP. AR-UNC97948, AR-UNC97964, AR-UNC0098045. The 25-well Project involves the construction of four new multi-well pads and associated infrastructure, the use of one existing multi-well pad and infrastructure, and the approval of 25 APDs. AR-UNC97956-57. One new well pad occurs on private surface over federal minerals. AR-UNC97944. Three well pads, including the existing well pad, are located on USFS managed lands. *Id.* The remaining new well pad is on private surface overlying private mineral estate, but would be used to drill horizontal well bores in which both the fee mineral estate and Federal mineral estate would be affected. *Id.*

On March 23, 2015, BLM and USFS announced their intention to prepare a joint EA for the 25-well Project, and provided a scoping period for public comments. AR-UNC79341. On June 18, 2015, BLM and USFS issued a preliminary EA. AR-UNC79346. In September 2015, BLM and USFS issued a final EA for the 25-well Project, including a response to comments on the preliminary EA and a draft FONSI. AR-UNC97938. On December 7, 2015, Scott G. Armentrout, Forest Supervisor, signed a Decision Notice and FONSI for the 25-well Project.

AR-UNC98311. Also on December 7, 2015, Sarah Dawson, Acting BLM Field Manager, signed

a FONSI for the 25-well Project. AR-UNC98306. The expected field duration of the 25-well

Project is 30-40 years and the effective life of wells could be as much as 50 years. AR-

UNC97995; AR-UNC98051. The 25-well Project only considered in detail the Proposed Action

and a No Action Alternative. AR-UNC97956; AR-UNC97999.

## ARGUMENT

I.    **BLM AND USFS FAILED TO CONSIDER A REASONABLE RANGE OF
      ALTERNATIVES**

The agencies' narrow range of alternatives for the Projects violates NEPA by

impermissibly omitting options that would meaningfully protect resource values in the planning

areas. An EIS must include "alternatives to the proposed action." *Fuel Safe Wash. v. FERC*, 389

F.3d 1313, 1323 (10th Cir. 2004) (quoting 42 U.S.C. § 4332(2)(C)(iii)). In an EIS, the agency

must "[r]igorously explore and objectively evaluate all reasonable alternatives." *Id.* (quoting 40

C.F.R. § 1502.14(a)). Consideration of alternatives is the "heart" of the environmental impact

statement. *Id.* The requirement to evaluate alternatives also applies to EAs. *See* 40 C.F.R. §

1508.9(b). In both EISs and EAs, federal agencies are required to "study, develop, and describe

appropriate alternatives to recommended courses of action in any proposal which involves

unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

To satisfy this obligation, the agency must give serious consideration to reasonable alternatives

beyond the no action and proposed alternatives. *See Davis v. Mineta*, 302 F.3d 1104, 1110 (10th

Cir. 2002). Here, BLM and USFS failed to consider reasonable alternatives that would protect

against the environmental and social costs of oil and gas exploration and development. Although

the right to develop an oil and gas lease becomes vested once a lease is issued, this does not

11

obviate the agencies' obligations under NEPA to consider reasonable alternatives that may reduce impacts. 43 C.F.R. § 3101.1-2; 43 U.S.C. §§ 1701(a)(8), 1712, 1732(b).

For example, in both the Bull Mountain EIS and 25-well EA, it would have been reasonable for BLM to consider a phased development alternative. *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 841, 846 (9th Cir. 2007) (upholding district court's injunction on development until BLM completed a revised EIS that considered a phased development alternative). Conservation Groups urged the agencies to consider a staged or phased development alternative for both Projects, which would involve clustering drilling geographically to maintain open areas and allowing concentrated development that proceeds in stages rather than all at once. AR-UNC10674-75; AR-UNC92669-70. Such an alternative could include limitations on the number of drilling rigs operating in the Project areas at any one time, as well as interim surface reclamation measures to restore each site to a pastoral landscape before drilling a new site. *Id.* Operators would develop production in one geographic area at a time and, when complete, would move on to another area. *Id.* Corridors could be left undeveloped to allow for wildlife management. *Id.* Phased development could limit new well drilling and fracking to a rate similar to the historical rate for the area. AR-UNC10674. Phased development would protect the environment by reducing pollution and traffic, while preserving open space for recreation, wildlife, and scenery. *Id.* Nevertheless, the agencies dismissed Conservation Groups' proposed phased development alternatives.

In the Bull Mountain MDP EIS, the BLM acknowledged that commenters had suggested "considering additional phasing time frames to extend the drilling horizon," but the agency failed to address why the alternative was eliminated from consideration. AR-UNC27596. In the 25-well Project EA, the agencies noted commenters' suggestion to "consider fewer pads to reduce

environmental impacts by limiting pace of development," but responded only that the proposed

action would "develop the Federal mineral resources in a logical and timely manner and reduce

unnecessary disturbance by drilling from fewer locations on the landscape," without explaining

why an alternative proposing even fewer pads and a longer timeline for development was

implausible. AR-UNC97999. The agencies' out-of-hand dismissals of the phased development

alternative are arbitrary and capricious because the agencies failed "to demonstrate that the

decision maker considered the alternatives and gave plausible reasons why they were rejected."

*All Indian Pueblo Council v. U.S.*, 975 F.2d 1437, 1446 (10th Cir. 1992).

The reasonableness of the alternatives in a NEPA analysis is measured in part by the

agency's statutory mandate. *Westlands Water Dist. v. U.S. DOI*, 376 F.3d 853, 866 (9th Cir.

2004). Reasonableness is also judged with reference to an agency's objectives for a particular

action. *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174-75 (10th Cir. 1999). By both

criteria, BLM and USFS had a duty to consider phased development alternatives for the Projects.

FLPMA mandates that public lands be managed to protect scenic, environmental,

recreational, and wildlife values; to "provide food and habitat for fish and wildlife"; and to

"provide for outdoor recreation." 43 U.S.C. § 1701(a)(8). Likewise, one of the purposes of the

Forest Service Organic Act is to "improve and protect the forest within the [boundaries]," 16

U.S.C. § 475, and USFS is directed under the Multiple-Use Sustained-Yield Act to regulate

Forest Service lands for five resources, including "outdoor recreation" and "wildlife and fish

purposes." 16 U.S.C. § 528.  Moreover, both BLM and USFS are "multiple use" agencies. 43

U.S.C. § 1732(a); 16 U.S.C. § 528. "'Multiple use' requires management of the public lands and

their numerous natural resources so that they can be used for economic, recreational, and

scientific purposes without the infliction of permanent damage." *Public Lands Council v.*

*Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999). In short, BLM and USFS are under statutory mandates to manage public lands for multiple uses, which cannot be achieved here without the consideration of alternatives that preserve environmental values. The agencies arbitrarily ignored this mandate through the Projects' myopic range of alternatives.

The reasonableness of a phased development alternative is also evident in the Projects' purpose and need statements. As described for the 25-well project, "[t]he purpose of the action is to provide SG [SG Interests] and GE [Gunnison Energy] the opportunity to develop oil and gas resources consistent with their Federal oil and gas leases *in an environmentally responsible manner*." AR-UNC97947 (emphasis added). For the Bull Mountain MDP, BLM similarly identifies the need to strike a balance between "consider[ing] the proponent's request for approval of an MDP to develop federal fluid minerals" and honoring BLM's mission "to conserve natural, historical, cultural, and other resources on the lands it administers." AR-UNC27453.

The White House Council on Environmental Quality ("CEQ") has explained that, when deciding how to balance competing resource uses, NEPA requires consideration of alternatives that strike a range of protections. 46 Fed. Reg. 18,026 (March 23, 1981). Moreover, CEQ explained that "[r]easonable alternatives include those that are *practical or feasible* from the technical and economic standpoint and using common sense, rather than simply *desirable* from the standpoint of the applicant." *Id.* at 18,027. Phased development allows oil and gas lessees to exploit mineral resources in a manner consistent with their vested rights, while also reducing uncertainties and offering a range of benefits to other environmental resources and public lands values—exactly the kind balancing that NEPA demands be explored, analyzed, and disclosed to decisionmakers and the public through alternatives. *See* 42 U.S.C. § 4331(b)(3). This type of

consideration is perhaps most critical at the drilling stage, where BLM and USFS approval represents the final step before on the ground impacts occur. If alternatives exist that may reduce or mitigate those harms, it is arbitrary for the agencies to ignore them. *See Davis*, 302 F.3d at 1120.

## II.     BLM AND USFS FAILED TO TAKE A HARD LOOK AT DIRECT, INDIRECT, AND CUMULATIVE IMPACTS TO PEOPLE AND THE ENVIRONMENT

NEPA imposes "action-forcing procedures … requir[ing] that agencies take a hard look at environmental consequences." *Robertson v. Methow Valley*, 490 U.S. 332, 350 (1989) (internal quotations and citations omitted). The purpose of the "hard look" requirement is to ensure that the "agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 97 (1983). These "environmental consequences" may be direct, indirect, or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8; *see also Hillsdale Envtl. Loss Prevention v. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012). BLM determines whether direct, indirect, or cumulative impacts are significant by accounting for both the "context" and "intensity" of those impacts. 40 C.F.R. § 1508.27.

An environmental effect is "reasonably foreseeable" if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *Sierra Club v. Marsh,* 976 F.2d 763, 767 (1st Cir.1992). An agency's hard look examination "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Forest Guardians v. U.S. Fish & Wildlife Serv.,* 611 F.3d 692, 712 (10th Cir. 2010) (internal citations omitted). "Looking to the standards set out by regulation and by statute, assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable

15

commitment of resources' is made." *Richardson,* 565 F.3d at 718; *see also* 42 U.S.C. §

4332(2)(C)(v); 40 C.F.R. §§ 1501.2, 1502.22; *Sierra Club v. Hodel*, 848 F.2d 1068, 1093 (10th

Cir. 1988) (holding agencies are to perform hard look NEPA analysis "before committing

themselves irretrievably to a given course of action so that the action can be shaped to account

for environmental values."). In particular, where, as here, BLM and USFS failed to prepare site-

specific NEPA analysis at the leasing stage underlying these Projects, the agencies' failure

provide such analysis at this, the point of project implementation, means that the impacts of this

development have *never* undergone the hard look analysis that NEPA demands.

> ### A.      BLM and USFS Failed to Take a Hard Look at Greenhouse Gas Pollution and Climate Change.

To fulfill their obligations under NEPA, agencies must take a hard look at the direct,

indirect, and cumulative effects of the greenhouse gas ("GHG") emissions attributable to an

action on climate change. "Direct" emissions are those from production, including venting,

flaring, and leaks. 40 C.F.R. § 1508.8(a). "Indirect" emissions include transportation,

downstream uses, and combustion of produced oil and gas. *Id.* §1508.8(b) "Cumulative"

emissions require consideration of the project's emissions alongside other past, present, and

foreseeable emissions, which includes all other BLM-managed oil and gas leasing and

development emissions. *Id.* § 1508.7.

BLM and USFS acknowledge, as they must, that the climate is changing, that these

changes will have severe consequences, and that human emissions—in particular, emissions

from fossil fuel combustion—are the primary driver of these changes. AR-UNC27658-61 (Bull

Mountain EIS); AR-UNC98020 (25-well EA). Other agencies have also affirmed these basic

principles. *See, e.g.*, *Coal. for Responsible Reg., Inc. v. EPA*, 684 F.3d 102, 120-22 (D.C. Cir.

2012) (holding that vast body of scientific evidence supports EPA's determination that human

emissions drive climate change). However, BLM and USFS's sole discussion of how the Projects would impact climate change is an estimate of the amount of GHGs that would be directly emitted by oil and gas drilling and related activity in the project areas. AR-UNC27826, AR-UNC27836, AR-UNC27842-43 (Bull Mountain EIS); AR-UNC98103-04 (25-well EA).

NEPA requires a much broader and more searching analysis. First, BLM and USFS failed to analyze the foreseeable indirect GHG emissions resulting from combustion or other end uses of the oil and gas extracted from the Projects. Second, BLM and USFS failed to discuss the cumulative impact of the Projects' emissions on climate change when added to emissions from BLM-managed lands on a regional and national scale. Finally, NEPA requires more than a mere disclosure of the volume of emissions: BLM must analyze the significance and severity of emissions, so that decisionmakers and the public can determine whether and how those emissions should influence the choice among alternatives. *See Methow Valley,* 490 U.S. at 351-52 (recognizing that EIS must discuss "adverse environmental effects which cannot be avoided[,]" which is necessary to "properly evaluate the severity of the adverse effects").

### 1. BLM and USFS failed to analyze the foreseeable indirect impacts of oil and gas.

No analysis of the indirect impacts from oil and gas production exists in the Bull Mountain EIS or 25-well EA, in violation of NEPA. Regulations require analysis of indirect effects, "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). The CEQ (whose interpretations of NEPA regulations receive judicial deference)[4] and numerous courts have held that the reasonably foreseeable effects of allowing fossil fuel extraction on public lands include the emissions resulting from eventual combustion of that fuel. *See* 81 Fed. Reg. 51,866 (Aug. 5,

---

[4] *See Wyoming v. USDA,* 661 F.3d 1209, 1260 n.36 (10th Cir. 2011) (recognizing CEQ guidance is "persuasive authority" for interpreting NEPA and its implementing regulations).

2016);[5] *WildEarth Guardians v. OSMRE*, 104 F. Supp. 3d 1208, 1229-30 (D. Colo. 2015)

(vacated as moot) (recognizing that "combustion is therefore an indirect effect of the approval of

the mining plan modifications"); *Diné CARE v. OSMRE*, 82 F. Supp. 3d 1201, 1213 (D. Colo.

2015) (vacated as moot) (holding that "combustion-related impacts … are an 'indirect effect'

requiring NEPA analysis."); *High Country Conserv. Advocates v. U.S. Forest Serv.,* 52 F. Supp.

3d 1174, 1189-90 (D. Colo. 2014) (recognizing that the agencies "do not dispute that they are

required to analyze the indirect effects of GHG emissions"); *Mid States Coal. for Progress v.

Surface Transp. Bd.*, 345 F.3d 520, 549-50 (8th Cir. 2003) (finding where agency action will

foreseeably increase coal consumption, NEPA requires analysis of consumption emissions);

*Mont. Envtl. Info. Ctr. v. U.S. OSMRE,* 274 F. Supp. 3d 1074, 1099 (D. Mont. 2017) (requiring

consideration of coal combustion emissions from coal extracted from mine).

In particular, recent cases concerning oil and gas at both the planning and leasing stages

have required consideration of downstream emissions. In *San Juan Citizens Alliance v. Bureau

of Land Management*, the court held that "failure to estimate the amount of greenhouse gas

emissions which will result from consumption of the oil and gas produced as a result of

development of wells on leased areas was arbitrary." No. 16-cv-0376-MCA-JHR, 2018 WL

---

[5] CEQ, *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews* (hereinafter "CEQ Final Guidance"), available at: https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf, is intended to "facilitate compliance with existing NEPA requirements." *See also* 40 C.F.R. §§ 1500-1508. The Court may take judicial notice of this and other factual documents under Federal Rules of Evidence 201(b)(2), (c). While we recognize that the CEQ Guidance was withdrawn, 82 Fed. Reg. 16,576 (April 5, 2017), this does not preclude agencies from utilizing the tools described therein to analyze the impacts of its actions on climate change when conducting environmental reviews under NEPA. *See also San Juan Citizens Alliance v. Bureau of Land Mgmt.*, No. 16-cv-0376-MCA-JHR, 2018 WL 2994406, at *10 n.5 (D.N.M. June 14, 2018) (citing CEQ Final Guidance and recognizing that "to the extent the reasoning is logically sound and consistent with case law, the Court finds it persuasive and worthy of citation.").

2994406, at *11. In *Western Organization of Resource Councils v. Bureau of Land Management,* the court found it erroneous to fail to consider, at the earliest possible stage, "the environmental consequences of the downstream combustion of coal, oil, and gas resources potentially open to development" under the agency's RMPs. No. 16-cv-0021-GF-BMM, 2018 WL 1475470 at *13 (D. Mont. March 23, 2018).

BLM and USFS failed to analyze the foreseeable emissions that will result from the processing, transmission, storage, distribution, and end use of hydrocarbons from 146 and 25 wells, respectively. As recently explained by the D.C. Circuit regarding downstream emissions:

> Quantification would permit the agency to compare the emissions from this project to emissions from other projects, to total emissions from the state or the region, or to regional or national emissions-control goals. Without such comparisons, it is difficult to see how [the agency] could engage in 'informed decision making' with respect to the greenhouse-gas effects of this project, or how 'informed public comment' could be possible.

*Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017). The agencies wholesale omission of these indirect emissions violated NEPA. *Border Power Plant v. Dep't of Energy*, 260 F. Supp. 2d 997, 1013, 1028-29 (S.D. Cal. 2003) (finding agency failure to disclose project's indirect emissions violates NEPA).

## 2. BLM and USFS failed to analyze the cumulative impacts of greenhouse gas pollution and climate change.

BLM and USFS also failed to analyze the cumulative, incremental contribution of GHG emissions from the Bull Mountain MDP and 25-well Project when added to other past, present, and reasonably foreseeable future oil and gas emissions emanating from the agency's management on a regional and national scale. *See* 40 C.F.R § 1508.7. Here, the agencies described the cumulative, incremental nature of climate change but failed to provide any corresponding analysis of the Projects when added to regional and national emissions, as

required by NEPA. AR-UNC27659 (Bull Mountain EIS); 98020 (25-well EA). *See San Juan*

*Citizens Alliance*, No. 16-cv-0376-MCA-JHR, 2018 WL 2994406, at *14 (recognizing that

conclusory statements regarding cumulative climate impacts are "insufficient to comply with

Section 1508.7."). Indeed, the court in *San Juan Citizens Alliance* linked BLM's failure to

quantify indirect GHG emissions with the broader analysis of cumulative climate impacts,

requiring that "analysis must be conducted anew given BLM's failure to consider downstream

greenhouse gas emissions." *Id.* at 15.

The agencies must also consider the cumulative GHG impacts of these new oil and gas

projects in the relevant context, 40 C.F.R. § 1508.27(a), as required to inform the

decisionmaking process and the public about the significance of GHG pollution and associated

impacts from climate change. *See, e.g., Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172,

1217 (9th Cir. 2008) ("[T]he fact that climate change is largely a global phenomenon that

includes actions that are outside of the agency's control does not release the agency from the

duty of assessing the effects of *its* actions on global warming within the context of other actions

that also affect global warming."). Here, BLM and USFS failed to provide any "quantified or

detailed information" on cumulative GHG impacts, *Neighbors of Cuddy Mountain v. U.S. Forest

Serv.,* 137 F.3d 1372, 1379 (9th Cir. 1998), which is below the threshold of "meaningful

analysis" courts demand. *Grand Canyon Trust v. FAA,* 290 F.3d 339, 341, 345 (D.C. Cir.2002).

In the Bull Mountain EIS, BLM did not provide *any* quantified information or

meaningful analysis of cumulative climate change impacts, in violation of NEPA. AR-

UNC27836 (asserting inability to assess cumulative climate change because doing so would

require a "global scale emissions inventory/budget and many resources"). *San Juan Citizens

Alliance*, No. 16-cv-0376-MCA-JHR, 2018 WL 2994406, at *14.

In the 25-well EA, while the agencies disclose direct GHG emissions (but not indirect) from the 25-well and Bull Mountain projects, and provide general emissions included in the Colorado Air Resources Management Modeling Study ("CARMMS"), there is no analysis of these values, alone or in combination. AR-UNC98103. There is also no discussion of whether the CARMMS values—512,373 tons per year of carbon dioxide and 18,989 tons per year of methane from federal and non-federal oil and gas development—are significant. Even if the agencies are permitted to rely on CARMMS for regional GHG emissions—rather than doing their own independent analysis of cumulative emissions from the 25-well Project, together with other projects in the cumulative effects area—the agencies still failed to disclose whether those values are significant. The agencies then conclude that "the GHG contribution associated with the [25] wells is extremely small" and "the project would have *no* measurable impact on the climate." AR-UNC98023 (emphasis added). This dismissive treatment is arbitrary. *San Juan Citizens Alliance*, No. 16-cv-0376-MCA-JHR, 2018 WL 2994406, at *15.

Indeed, a cumulative effects analysis "must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." *Grand Canyon Trust,* 290 F.3d at 342. Even assuming *arguendo* the environmental impacts of developing an individual project were minimal, these impacts may nevertheless be significant when added to other environmental impacts on existing and future federal oil and gas development. In the context of climate change, it is precisely the incremental contribution of emissions across myriad sources that have, together, resulted in the current crisis. The record demonstrates not only the magnitude of the threat posed by climate change, but also the importance for federal decisionmaking to consider how a given project's impacts contribute to or otherwise amplify this threat. Notably, BLM and USFS were aware of this threat, as demonstrated by their consistent citation in their NEPA

21

analyses for the Projects to the IPCC's findings regarding the effects of GHG emissions on climate change. AR98020 (25-well EA); AR-UNC27659 (Bull Mountain EIS)

"NEPA's implementing regulations require an agency to evaluate 'cumulative impacts' along with the direct and indirect impacts of a proposed action." *TOMAC v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (citing *Grand Canyon Trust,* 290 F.3d at 341, 345). Despite a robust body of scientific information and data before the agency warning about climate disruption and, indeed, BLM's contributions to the problem through its management of federal oil and gas leasing and development, the agency disclaimed responsibility and "failed to consider an important aspect of the problem" when it refused to provide any hard look analysis of GHG pollution and associated climate change impacts in its project decisions. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). BLM must analyze the cumulative impacts of its actions to inform the agency's determination as to "whether, or how, to alter" the plan "to lessen cumulative impacts." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999).

3. **BLM failed to apply the Social Cost of Carbon protocol, which offers a measure to evaluate the magnitude and severity of GHG pollution impacts.**

BLM and USFS further violated NEPA by failing to take a hard look at the magnitude and severity of GHG emissions from the Projects. The agencies simply estimated that the Bull Mountain MDP and the 25-well Project would result in 44,389 and 25,448 tons, respectively, of annual direct GHG emissions, AR-UNC27828; AR-UNC98103. NEPA requires a more searching analysis than merely disclosing the amount of pollution. Rather, BLM and USFS must examine the "ecological[,]… economic, [and] social" impacts of those emissions, including an

assessment of their "significance." 40 C.F.R. §§ 1508.8(b), 1502.16(a)-(b).[6] A fundamental purpose of NEPA is to "bring environmental factors to peer status with dollars and technology in [agency] decisionmaking." *Sierra Club v. Morton*, 510 F.2d 813, 826 (5th Cir. 1975); 42 U.S.C. § 4332(2)(B). BLM and USFS's assertions that they need not undertake a "detailed, quantified analysis of non-market/social impacts" is anathema to this fundamental goal of NEPA to prevent the marginalization of environmental impacts. AR-UNC27330 (Bull Mountain EIS); *see also* AR-UNC98271 (25-well EA) ("a qualitative evaluation of climate change, as presented in the EA, is appropriate").

BLM and USFS stated that they could do no more than disclose the amount of emissions because "uncertainty in applying results from global climate models to the regional or local scale…limits the ability to quantify potential future impacts from GHGs," AR-UNC27819 (Bull Mountain EIS), and "no readily available tools exist to predict impacts a project's emissions would have on the global, regional, or local climate," AR-UNC98023 (25-well EA). *Sierra Club v. FERC* rejected similar claims of uncertainty, recognizing that "some educated assumptions are inevitable in the NEPA process" and that "we have previously held that NEPA analysis necessarily involves some 'reasonable forecasting.'" 867 F.3d at 1374 (citing *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1092 (D.C. Cir. 1973); *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014)). The court further explained "the effects of assumptions on estimates can be checked by disclosing those assumptions so that readers can take the resulting estimates with the appropriate amount of salt." *Id*. Moreover, these assertions do not justify BLM's failure to provide any analysis of the severity of ecologic,

---

[6] *See also* Sec. Order 3289 (requiring BLM to "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and mandating that "management decisions made in response to climate change impacts must be informed by [this] science.").

economic, or social impacts, because the record squarely demonstrates that at least one tool for

doing so "is and was available: the social cost of carbon protocol," which was "designed to

quantify a project's contribution to costs associated with global climate change." *High Country,*

52 F.Supp.3d at 1190. BLM and USFS were aware of the social cost of carbon protocol when

they prepared the Bull Mountain EIS and 25-well EA, but arbitrarily refused to apply it to

planning area emissions. AR-UNC10604; AR-UNC98269 (25-well EA).

   As explained by Conservation Groups' comments to BLM and USFS, AR-UNC10604,

the protocol "estimates the benefit to be achieved, expressed in monetary value, by avoiding the

damage caused by each addition metric ton (tonne) of carbon dioxide (CO2) put into the

atmosphere." Even if, as BLM and USFS suggest, it is infeasible to predict the specific physical

changes to the environment that will result from these specific emissions, the protocol provides a

method to "evaluat[e]" the emissions' impacts which is "generally accepted in the scientific

community," and which the agencies were not permitted to ignore. 40 C.F.R. § 1502.22(b)(4).

The protocol is one available means of filling the essential but unmet need in the analysis of

more "sharply defining the issues and providing a clear basis for choice among options by the

decisionmaker and the public." *Id.* at § 1502.14. Critically, the protocol not only contextualizes

costs associated with climate change, but can also be used as a proxy for understanding climate

impacts and to compare alternatives. *See id.* § 1502.22(a) (stating agency "shall" include all

"information relevant to reasonably foreseeable significant adverse impacts [that] is essential to a

reasoned choice among alternatives").

   Moreover, BLM and USFS were particularly obligated to address the economic

downsides of GHG emissions, having included in the Bull Mountain EIS and 25-well EA their

assessment of the economic benefits from the projects. Although NEPA does not require BLM

24

to conduct cost-benefit analysis, 40 C.F.R. § 1502.23, it is "arbitrary and capricious to quantify the benefits of [an action] and then explain that a similar analysis of the costs [is] impossible when such an analysis [is] in fact possible." *High Country,* 52 F.Supp.3d at 1191; *see also Johnston v. Davis*, 698 F.2d 1088, 1094-95 (10th Cir. 1983) (holding agency may not present economic analysis in misleading way to give impression that benefits exceed costs, when evidence suggests the contrary); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446-48 (4th Cir. 1996) (stating "it is essential that the EIS not be based on misleading economic assumptions."); *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983) (holding if agency "trumpets" economic benefits, it must also disclose costs); *Ctr. for Biological Diversity*, 538 F.3d at 1200 (it is misleading to present economic analysis without assigning any cost to GHG emissions); *MEIC*, 274 F. Supp. 3d at 1098 (agency may not put its "thumb on the scale by inflating the benefits of the action while minimizing its impacts").

BLM and USFS "trumpeted" economic, revenue, and employment benefits of the Projects. For Bull Mountain, BLM contended that oil and gas development would provide 607 jobs, and that the project would contribute $115,602,739 to the local economy, along with oil and gas royalty distribution to planning area counties of a mere $973.30. AR-UNC28016-17; AR-UNC28019. For the 25-well Project, BLM and USFS declared that 29 jobs would be created during the construction phase, 96 jobs during the drilling phase, 166-196 jobs during the completion phase, 6-8 jobs during the production phase, and 38 jobs during the workover/planned maintenance phase, plus regional economic impacts of $537,559 for every $1,000,000 of project spending and additional royalties. AR-UNC97998; AR-UNC98076-77. However, as in *High Country*, BLM and USFS declined to quantify the economic *costs* of oil and gas development, including the associated GHG emissions, and thus arbitrarily created an

artificial bias in favor of oil and gas leasing and development.

The agencies attempt to sidestep this obligation, and Conservation Groups' comments regarding the social cost of carbon, by noting that formal cost benefit analysis is generally not required by NEPA. AR-UNC27330 (Bull Mountain EIS); AR-UNC98271 (25-well EA). As noted above, that is beside the point. A "misleading" analysis that prevents "the decisionmaker and the pubic" from making "an informed comparison of the alternatives" violates NEPA. *NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 811 (9th Cir. 2005) (quoting *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1989)). When an agency quantifies economic benefits, it must also quantify social costs. *MEIC*, 274 F. Supp. 3d at 1096-99. "NEPA mandates a rather finely tuned and 'systematic' balancing analysis in each instance." *Calvert Cliffs v. Atomic Energy Comm'n*, 449 F.2d 1109, 1113 (D.C. Cir. 1971). An agency's balancing analysis is arbitrary and capricious if it "tip[s] the scales of an EIS by promoting possible benefits while ignoring costs." *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983). This parallels the general principle of administrative law that "reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions" and further that "[n]o regulation is 'appropriate' if it does significantly more harm than good." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (emphasis in original).

The agencies also fail in their attempt to avoid using the social cost of carbon due to "uncertaint[ies]" associated with the rate of production, how the fuel would be used, and whether there will be changes in technology and climate. AR-UNC27330 (Bull Mountain EIS); AR-UNC98270-71 (25-well EA). First, BLM and USFS's concern over uncertainties associated with rate of production rings hollow. In fact, production data is readily available and could be used to estimate the social cost of carbon. The BLM Uncompahgre Field Office has produced a

Reasonable Foreseeable Development Scenario for Oil and Gas that predicts future production based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest. AR-UNC28098, AR-UNC28056. And, indeed, BLM and USFS relied on production estimates specific to the Bull Mountain MDP and 25-well Project elsewhere in their analysis. AR-UNC98021 (25-well EA, estimating development and production emissions); AR-UNC27821 (Bull Mountain EIS, same); *see also* AR-UNC28013, AR-UNC28019 (Bull Mountain EIS, estimating impacts on local fiscal conditions using projected production rates). Second, the agencies cannot simply assert that end uses of the fuel are speculative; NEPA requires that agencies support claims of unforeseeability with detail about missing information, and why the agency could not obtain it. 40 C.F.R. § 1502.22(b)(1); *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984). In fact, the record demonstrates that end uses from the Projects are foreseeable, where "[n]atural gas is currently delivered to the Bull Mountain Pipeline and the Ragged Mountain pipeline north of the Unit for delivery to local and national markets." AR-UNC27761 (Bull Mountain EIS); AR-UNC97966 (25-Well EA, same). Third, while the models cannot completely predict changes in technology or climate, the social cost of carbon protocol discloses its limitations and is designed to be revised as updated economic and scientific research becomes available. GAO-14-663, *Social Cost of Carbon* (July 24, 2014), at 17; AR-UNC19362 (SCC analysis of uncertainty "impressively thorough"). Agencies using the social cost of carbon have incorporated discussions of limitations into their analyses, and BLM and USFS could have done so here. GAO at 17-18 (providing examples). The social cost of carbon protocol is based on peer-reviewed scientific and economic studies, and its use has been upheld in federal court. *See, e.g., Zero Zone v. Dep't of Energy*, 832 F.3d 654, 677-78 (7th Cir. 2016). While the social cost of carbon protocol values involve a degree of

uncertainty and the protocol does not include all climate damages, it is a valuable tool for estimating the social cost of GHG emissions. *High Country*, 52 F. Supp. 3d at 1190-91 (explaining the value of the social cost of carbon in environmental impact analyses). Here, BLM and USFS appear to want to wait for perfect tools and perfect information with which to weigh costs and benefits, when what they are required to do is to provide a reasonable assessment of environmental effects. Under NEPA, more information is better—and appropriate context and caveats are welcome as necessary to assist the public and the decisionmaker. "Reasonable forecasting and speculation is…implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975).

Thus, because BLM did not otherwise satisfy NEPA's command to disclose the impact or significance of GHG emissions, and because BLM chose to quantify monetary benefits of oil and gas extraction, BLM's refusal to use available tools to similarly monetize the social cost of carbon emissions was arbitrary. Even if, counterfactually, BLM had articulated a reason for disagreeing with the dollar costs estimated by the interagency working group, BLM could not ignore this method of analysis entirely. "[B]y deciding not to quantify the costs at all," BLM implied that there were no such costs—that the social cost of a ton of carbon dioxide emissions was $0. *High Country,* 52 F.Supp.3d at 1192. Here, as in every other case considering the issue, that implication is unsupported and arbitrary, and contrary to NEPA.

**B.     BLM and USFS Failed to Take a "Hard Look" at the Impacts of Hydraulic Fracturing on Water Resources and Human Health.**

The agencies also failed to rigorously examine and disclose the broad spectrum of threats to resource values and human health from modern oil and gas drilling techniques, including

hydraulic fracturing or "fracking." The agency does not dispute its obligation to consider health impacts, nor could it do so. *See, e.g. Middle Rio Grande Conserv. Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002) ("'Effects' or impacts include 'ecological, ... aesthetic, historic, cultural, economic, social, or health' effects") (citing 40 C.F.R. § 1508.8). This obligation extends to possible effects as well as certain ones: unless the agency can certify that decisions "will not significantly impact the human environment" they must prepare an EIS covering "the potential environmental impacts of proposed actions." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1021 (10th Cir. 2009). Again, "[g]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002).

Conservation Groups called for BLM and USFS to assess the human health effects of fracking. *See, e.g.,* AR-UNC27332 (requesting in comments on the Bull Mountain EIS that BLM conduct a human health impact assessment for the North Fork Valley); AR-UNC92472 (requesting in comments on the 25-well Project that the agencies take a "hard look" at impacts to human health). In the Bull Mountain EIS, BLM did not respond at all to the call for a human health impact assessment, AR-UNC27334, and its treatment of health impacts was incomplete and dismissive. BLM attempted to excuse its failure, stating generally that "[f]ollowing Colorado Department of Public Health and Environment (CDPHE) guidelines, and applying standard lease stipulations…would reduce risk of contamination of water resources under all alternatives." AR-UNC28015; *see also* AR-UNC28020 ("In terms of water quality and quantity changes that may impact local communities, impacts are not anticipated, but may occur under any alternative."); AR-UNC27830 (finding that hazardous air pollution impacts would largely be within acceptable

levels, but ignoring significant sources of HAPs). In the 25-well EA, the agencies similarly relied

on compliance with regulation and design features to "reduce the risk of impacts on human

health from natural gas drilling." AR-UNC98118; *see also* AR-UNC98308 (FONSI) (any

impacts to public health "would be avoided by adherence to standard practices required for well

drilling activities"). For both Projects, the agencies failed to provide any analysis or detailed

information.

 The agencies' confidence that fracking will not impact human health is belied by record

evidence. *See, e.g.,* AR-UNC79468-77 (comments on 25-well Project, noting numerous attached

exhibits on fracking impacts); AR-UNC10629-36 (comments Bull Mountain MDP, noting

numerous attached exhibits on fracking impacts). For example, independent analysis of the Bull

Mountain MDP by an air quality expert presented a number of unacceptable health risks from

hazardous air pollutants ("HAPs") that were not considered in the EIS, including: (1) secondary

production of formaldehyde from chemical reactions of precursor emissions, (2) Mobile Source

Air Toxics such as methanol, chlorinated solvents, carbonyl compounds, and diesel particulate

matter, and (3) HAP impacts associated with volatile emissions from hydraulic fracturing fluids.

AR-UNC10697. The same omissions are present in the 25-well Project EA. AR-UNC98241.

Likewise, the record demonstrates that exposure to ozone is linked to a wide range of health

effects, including aggravated asthma, increased emergency room visits and hospital admissions,

and premature death. AR-UNC10594 (citing research); AR-UNC92472 (citing research). BLM

and USFS did not address these impacts from either Project.

 Record evidence also shows that contaminants from drilling and fracking operations can

contaminate both ground and surface water, which can result in serious harms to human health.

*See, e.g.,* AR-UNC16768 (predicting frack fluids can migrate to aquifers within years); AR-

UNC16771 (annotated collection of industry documents showing how gas can migrate from targeted formations); AR-UNC53174-75 (presenting health effects of fracking chemicals used and proposed to be used in the Bull Mountain Unit). These risks of contamination are not just theoretical: the record is also replete with evidence of contamination that has already occurred, including EPA's draft report investigating groundwater contamination near Pavillion, Wyoming ("Pavillion Report"). AR-UNC18413 (Bull Mountain EIS); AR-UNC86968 (25-well EA).  The record contains numerous examples of fracking-related contamination from around the country, including in Colorado. AR-UNC10629-36 (Bull Mountain EIS); AR-UNC79472-76 (25-well EA).

Nevertheless, the Bull Mountain EIS summarily concludes that, because casings will be cemented and are subject to inspection, and because target formations are distant from potable groundwater, "hydraulic fracturing is not expected to impact potable groundwater resources." AR-UNC 27887-88. The EIS does not confront the common ways that cement coverage can be incomplete or flawed, or the fact that, "even after a flawless cement job, the cement can still be damaged by the routine operation of the well," AR-UNC16776 (annotated industry document), *see also* AR-UNC16773 (same). BLM does not acknowledge that, as industry documents demonstrate, loss of well integrity is a ubiquitous and common problem. AR-UNC16781. Nor does BLM consider new evidence that suggests that, even after fracking ends, fracking chemicals remain underground under pressure and can travel through faults and fractures to contaminate aquifers within years. AR-UNC16769-70.

The 25-well EA acknowledges the risk of fracking-related contamination and associated human health impacts. For example, the 25-well EA recognizes the threat of groundwater contamination from development of the project. AR-UNC98068; AR-UNC98112. This includes

contamination of groundwater with methane, benzene, toluene, ethylbenzene, and xylene ("BTEX"). AR-UNC98112. In fact, as the EA recognizes, "baseline monitoring" already "shows the presence of methane and BTEX at low concentrations." AR-UNC98112; *see also* AR-UNC98068 (studies by the USGS in Garfield County of nearby formations where evidence of shallow aquifer contamination from methane and BTEX was found, USFS also stating that "[i]f methane increased in surface waters or shallow groundwater due to hydraulic fracturing that "could be long lasting" and that such methane could "reach a level of concern or hazard."). Exposure to these chemicals can cause serious detrimental health effects. *See generally* AR-UNC79538 (health effects analysis of fracking chemicals). Despite these acknowledgements, the 25-well EA provides no site-specific analysis and fails to propose sufficient mitigation to assure well bore integrity. The only measure offered to protect groundwater was proposed by industry, and simply includes the baseline sampling and monitoring of groundwater. AR-UNC98156. Such dismissive treatment is insufficient to support the agencies' FONSI. AR-UCN98306. Baseline sampling and monitoring may allow the agencies to understand the extent of the problem after it occurs, but they do nothing to mitigate the problem or reduce the risk of harm to human health, and do not "constitute an adequate buffer against the negative impacts that may result." *Nat'l Parks & Conservation v. Babbitt,* 241 F.3d 722, 735 (9th Cir. 2001).

**C.     BLM and USFS Failed to Take a Hard Look at Cumulative Impacts of the Project to Specific Resources.**

Finally, BLM and USFS failed to take a hard look at the cumulative impacts of the two Projects' development on specific resources. NEPA's implementing regulations explain that a cumulative impact is the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. "Significance exists if it is reasonable to anticipate a cumulatively significant

impact on the environment." *Id.* § 1508.27(b)(7). "In order for Plaintiffs to demonstrate that the BLM failed to conduct a sufficient cumulative impact analysis, they need not show what cumulative impacts would occur…only the potential for cumulative impact." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010). "To hold otherwise would require the public, rather than the agency, to ascertain the cumulative effects of a proposed action." *Id.*

Here, the Bull Mountain EIS included a list of other foreseeable fossil fuel development in the area, but failed to take the critical next step of analyzing the incremental impact of the Bull Mountain MDP when added to these additional projects. AR-UNC27798-27803; 40 C.F.R. § 1508.7. While "'certainty as to the cumulative effects of resource development'" is not required, the agency must at least "'mention and discuss foreseeable problems.'" *Wyoming Outdoor Council v. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1243 (D. Wyo. 2005) (quoting *Manygoats v. Kleppe*, 558 F.2d 556, 560–61 (10th Cir. 1977)). BLM's failure to provide any analysis to support its conclusions about cumulative impacts was arbitrary and capricious.

With respect to the 25-well EA, BLM and USFS's consideration of cumulative impacts was insufficient, and failed to support their FONSI. Even where direct impacts may appear insignificant when viewed in isolation, potential cumulative impacts are enough to warrant preparation of an EIS. And at the very least, BLM and USFS are still required to provide hard look cumulative analysis to support their conclusion, and may not simply ignore the overall impact of the project when considered alongside other development in the area.

Taken together, these Projects suffer "the tyranny of small decisions," *Kern*, 284 F.3d at 1078, and fail to confront the possibility that the agency actions may contribute to cumulatively

significant effects, including to air quality, water quantity, and wildlife. 40 C.F.R. §§ 1508.7, 1508.27(b)(2).

>    1.    **The agencies failed to take a hard look at cumulative impacts to air quality.**

The agencies' analyses of cumulative air quality impacts for the Projects are flawed because the agencies: (1) improperly relied on CARMMS, which does not consider relevant factors, rather than undertaking a comprehensive regional inventory; and (2) failed to properly assess background concentrations of pollutants and improperly assumed that air pollution would be acceptable if no National Ambient Air Quality Standards ("NAAQS") are violated.

First, the agencies improperly relied on CARMMS for their cumulative impacts analyses rather than undertaking independent regional air modeling. AR-UNC27836 (Bull Mountain EIS); AR-UNC98103 (25-well EA). CARMMS is an air modeling study that evaluated potential impacts on air quality in Colorado using projections of oil and gas development, up to a maximum of 10 years in the future. AR-UNC27843. However, CARMMS is not up-to-date and, critically, does not contain all emissions that may impact the study area. AR-UNC10704-06. For example, CARMMS omits emissions from state- and federal-permitted sources; from NEPA projects and RMPs in the neighboring states of Utah, Wyoming, and New Mexico; from coal transport; from the foreseeable Mesaverde gas play and other plays identified by industry; and from leasing on the Roan Plateau as projected by industry. *Id.* Instead, the agencies should have undertaken a comprehensive regional inventory to determine reasonably foreseeable cumulative air quality impacts. Reliance on inappropriate modeling, as here, renders NEPA analysis inadequate. *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964-65 (9th Cir. 2005).

Second, the agencies failed to accurately assess background concentrations of pollutants, including ozone, for which the federal government has established NAAQS. To take the required "hard look" at a proposed project's effects, an agency may not rely on incorrect assumptions or data. *NEC v. USFS*, 418 F.3d at 964 (citing 40 C.F.R. § 1500.1(b)). For both Projects, the agencies relied on inaccurate data, understating background concentrations of ozone and the cumulative impacts that over 170 gas wells—and hundreds of tons of additional ozone precursors—will have, when added to other foreseeable development in the area. AR-UNC27845, AR-UNC27275 (Bull Mountain EIS); AR-UNC98104 (25-well EA). For example, BLM and USFS ignored the recent EPA AirData provided by Conservation Groups, which demonstrates that monitored concentrations of ozone closest to the Bull Mountain Unit, in Rifle and Gothic and at McClure Pass, are already significantly above the level of the NAAQS, leaving virtually no room for growth in emissions. AR-UNC10688, AR-UNC92072.

In the Bull Mountain EIS, BLM defended its use of baseline data produced by CDPHE. AR-UNC27275. However, as pointed out by EPA, "[t]he background concentrations provided by CDPHE-APCD are rough estimates of expected conditions at the Bull Mountain Unit Project Area as there is no measured data available for this area; however, if representative backgrounds for the Bull Mountain Unit Project area are desired, ambient monitoring of this area should be conducted." AR-UNC79035. EPA further explained that "any industrial emission unit that has strong concentration gradients overlapping with impacts from the Bull Mountain Unit project should be explicitly modeled" and "added to the model-estimated impacts from the proposed project and nearby sources." *Id.* As recognized by EPA, the agencies' background data was stale and unreliable, and should be rejected. *See South Fork Band Council of Western Shoshone of Nevada v. Dep't of Interior*, 588 F.3d 718, 727-28 (9th Cir. 2009) (rejecting the use of a

35

surrogate model for air quality that the EPA had rejected); *Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562, 569–70 (9th Cir. 2016) (rejecting agency failure to survey "the actual baseline conditions" of the project site). Without properly modeling air pollution levels and impacts in the previously undeveloped project area, it is impossible for BLM and USFS to support their conclusion that the incremental increase in ozone from the Projects are cumulatively insignificant. *See* AR-UNC27274, AR-UNC27846 (Bull Mountain EIS, concluding pollutants "would likely be less" than the "small" contribution from federal oil and gas wells in the Uncompahgre Field Office); UNC98254 (25-well EA, concluding the projects' contribution to regional ozone is "acceptable").

BLM and USFS also inappropriately relied on compliance with NAAQS to justify not taking a close look at cumulative impacts to air quality. AR-UNC98254 (25-well EA); AR-UNC27357 (Bull Mountain EIS). As discussed above, ozone monitors in the region indicate that ozone levels are already exceeding the NAAQS on some days, by a considerable margin. AR-UNC10688. Particulate matter emissions in the area are also high. AR-UNC10690. Moreover, even if the agencies had demonstrated that development of wells in a previously undeveloped area would not result in violations of an NAAQS, BLM's NEPA obligation to take a hard look at cumulative impacts to air quality is separate and distinct from compliance with the Clean Air Act because the NAAQS are not the sole measuring standards for assessing whether development will significantly affect air quality. *See, e.g., Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1257 (D. Colo. 2012) ("The mere fact that the area has not exceeded ozone limits in the past is of no significance when the purpose of the EIS is to attempt to predict what environmental effects are likely to occur in the future[.]"). Therefore, the agencies were not excused from taking a hard look at cumulative air quality impacts in their NEPA analyses.

**2.** **The agencies failed to take a hard look at individual and cumulative impacts to water quantity.**

BLM and USFS also fail to sufficiently assess the direct and cumulative water quantity impacts from development of the Projects. 40 C.F.R. §§ 1508.7, 1508.8. Together, the Projects will consume over 850 million gallons of fresh water. *See* AR-UNC97987 (25-well Project: 48.2 million gallons); AR-UNC27458 (Bull Mountain MDP: 808.1 million gallons). While the agencies attempt to assess water depletions on fish (though inconsistently),[7] BLM and USFS fail to mention *any* other impacts, including on drinking water, agriculture, and wildlife.

In fact *nowhere* in either the 25-well EA or Bull Mountain EIS do the agencies "discuss and consider the effect of such water use on the environment," nor do the agencies analyze the cumulative impact that these projects will have together with other oil and gas development in the area. *San Juan Citizens Alliance*, No. 16-cv-0376-MCA-JHR, 2018 WL 2994406, at *19; 40 C.F.R. § 1508.7. In particular, there is no discussion of how water depletions from the Projects will impact the land, forests, wildlife, livestock, or human communities in the planning area, or how these impacts are further compounded in a drought-stricken Southwest that is poised to become even more parched in the face of climate change. These omissions violate NEPA.

Critically, because the water used for fracking is mixed with fracking fluids, it is "gone for good from the hydrological cycle." AR-UNC88251. Removing water for fracking can lower water tables, dewater aquifers, and reduce surface flows and supplies. AR-UNC88252, 60, 64, 67, 69. This can result in changes to water quality and alter the hydrology of water systems.

_____

[7] The agencies offer contradictory conclusions on fish, finding that the Projects both will and will not cause impacts. *Compare* AR-UNC27922 (water reductions will threaten fish), with AR-UNC27931 (no substantial reductions in water), and AR-UNC98113 (potential impacts), with AR-UNC98045 (no direct impacts). Such "inconsistency…is, absent explanation, 'the hallmark of arbitrary action.'" *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1145 (9th Cir. 2015).

GAO-11-35, *Energy-Water Nexus* (October 2010), at 12-13. Notably, BLM recognized the

impacts to surface and groundwater flow patterns in its EA for the Bull Mountain MDP, AR-

UNC31611, but entirely omitted any mention of such impacts in its EIS, and failed to explain its

choice. *Kern,* 284 F.3d at 1075 (requiring detailed information or explanation why "more

definitive information could not be provided"). The agencies' failure to even "mention and

discuss foreseeable problems" is arbitrary and capricious. *Wyoming Outdoor Council*, 351 F.

Supp. 2d at 1243.

> **3.   The agencies failed to take a hard look at cumulative impacts to wildlife.**

The Bull Mountain MDP and 25-well Project fail to take a hard look at cumulative

impacts to wildlife in the area, despite the agencies' having long been on notice that

"comprehensive analysis" was needed "prior to authorizing significantly expanded

development." AR-UNC49644. The Colorado Division of Wildlife ("CDW"), among others,

repeatedly emphasized the need to "[p]lan development activities at the largest scale possible

(i.e. landscape level)," and to "phase and concentrate all development activities." AR-

UNC54006, 07, 21. As early as 2009, CDW pointed out to BLM:

> [T]he scale of the proposed development is unprecedented for this relatively
> pristine area. Impacts to wildlife, especially cumulative impacts, may be far
> reaching. We are concerned about the potential long-term displacement of big
> game from areas proposed for development, and how that might affect the overall
> carrying capacity of the adjacent habitats and long-term population trends for big
> game in the area. We are also concerned about the potential loss of remote and
> primitive hunting opportunities within and immediately adjacent to areas
> proposed for development. These issues should be thoroughly evaluated and
> disclosed in your NEPA document.

UNC54004. Both BLM and USFS have failed to conduct this cumulative analysis and apply

information about the impacts of the Projects, together with other oil and gas development in the

area. 40 C.F.R. § 1508.7. This failure is particularly apparent for elk and mule deer.

As stated by Colorado Parks & Wildlife ("CPW"):

Critical winter habitats are known to be a limiting factor on big game populations in western Colorado…. Recent research clearly documents that the ongoing human disturbance associated with oil and gas production and maintenance activities continues to displace big game long after drilling activities have ceased. These residual adverse impacts to wildlife occur from reduced habitat effectiveness regardless of site specific Conditions of Approval or Best Management Practices implemented by the operator to reduce impacts, and do not address the cumulative impacts of increasing well pad density and ancillary facilities (roads, pipelines, compressors, etc.) on the effectiveness of wildlife habitats in the areas.

AR-UNC79421 (internal citations omitted). Studies have also shown that elk and mule deer are displaced by or avoid roads and well sites when well densities are as low as 1 well pad per section and road densities are as low as .5 mile of road per square mile. AR-UNC34879-80.

The Bull Mountain MDP is within and/or includes elk and deer "crucial winter range," which includes severe winter range and winter concentration areas for elk, and concentration areas, winter range, critical winter range, and severe winter range for deer. AR-UNC26590, AR-UNC26384-86; AR-UNC54526. BLM also admitted "elk have no contiguous habitat to relocate to." AR-UNC27920. BLM's chosen alternative for Bull Mountain would result in at least 26 of the 33 well pads located within and directly adjacent to the core areas of the crucial elk and mule deer winter habitat areas, yet the agency still failed to provide any meaningful cumulative analysis. *See* AR-UNC27582 (overlay of Winter Habitat Plan with proposed wells). Instead, BLM simply lists other foreseeable projects without providing any of the needed analysis of the aggregate impacts on elk, mule deer, and their habitat. AR-UNC27798-803; AR-UNC27931-33. BLM's statements on these species fail to acknowledge major projects, offer no analysis of the impacts of projects on wildlife, and ultimately fail to draw any conclusion about the significance of these impacts. *Id.*

39

As before, BLM attempts to excuse its "broad and generalized" cumulative analysis by claiming the agency lacked "detailed information that would result from site specific decisions and other activities or projects." AR-UNC27786. The agencies have not, however, offered any explanation as to what information was needed, but that they did not have or could not obtain, in order to perform this analysis. *Cf.* 40 C.F.R. § 1502.22. In fact, Conservation Groups and others provided BLM with a wealth of information about resource extraction projects and proposals within the Upper North Fork Valley. *See, e.g.,* AR-UNC10589-92. CPW has also called on BLM to undertake a robust cumulative impacts analysis in the face of growing impacts to wildlife health. AR-UNC21566. The BLM's analysis of cumulative effects to wildlife neither "reflect[s] the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project," nor "provide[s] a reviewing court with the necessary factual specificity to conduct its review," and thus violates NEPA. *Comm. to Preserve Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993).

Moreover, while agencies have discretion to define the area of analysis for consideration of cumulative impacts, *Kleppe v. Sierra Club,* 427 U.S. 390, 414 (1976), "the choice of analysis scale must represent a reasoned decision and cannot be arbitrary." *Idaho Sporting Cong. v. Rittenhouse,* 305 F.3d 957, 973 (9th Cir. 2002). Here, BLM arbitrarily limited the scope of analysis to within the Unit boundaries, which was inconsistent with CPW recommendations and a fundamental understanding of these species. AR-UNC27932-33.

The 25-well EA also failed to address cumulative impacts on elk and mule deer. Four of the five proposed pad locations in the 25-well Project are within or adjacent to an elk winter concentration area. AR-UNC79407. According to comments on the Project from CPW, this winter concentration area is "very important for big game populations" because increases in

40

elevation to the north, west, and east make adjacent areas largely inaccessible to big game during winter months. *Id.* As a result, displacement from this geographically isolated area "could have significant negative ramifications for big game populations." *Id.* CPW also specifically expressed concern "that the proposed pad locations and access routes will unnecessarily fragment wildlife habitat and exacerbate functional habitat loss already occurring in the surrounding area due to development of the adjacent Bull Mountain, Deadman Gulch, and Iron Point Units." AR-UNC0079408. Yet, as with the Bull Mountain EIS, the agencies failed to analyze cumulative impacts, rationalizing that the Project, "even when considered with all other projects in the area, is not likely to result in significant changes to elk populations." AR-UNC98115. The EA fails to even mention cumulative impacts to mule deer, a species whose numbers are declining across Colorado and the West. AR-UNC92656.

Where, as here, reduced habitat effectiveness cannot be sufficiently avoided, minimized, or mitigated with site-specific Conditions of Approval or Best Management Practices, the failure to conduct this analysis is particularly egregious, resulting in approvals for oil and gas without understanding the true cost it will have on elk and mule deer. *See Kern*, 284 F.3d at 1078 (restricted cumulative effects analysis that understates true impacts is arbitrary and capricious).

## CONCLUSION

For the foregoing reasons, Conservation Groups respectfully request the Court to declare that BLM's approval of the Bull Mountain EIS, and BLM and USFS's approval of the 25-well EA violated NEPA and its implementing regulations; vacate and remand those NEPA documents to the agencies; and enjoin Federal Defendants from approving the development of resources within the Bull Mountain MDP and the 25-well Project area until Federal Defendants have demonstrated NEPA compliance.

Respectfully submitted this 13th day of July 2018,

/s/ Laura King
Laura King, MT Bar No. 13574
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 204-4852
king@westernlaw.org

Kyle J. Tisdel, CO Bar No. 42098
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, New Mexico  87571
(575) 613-8050
tisdel@westernlaw.org

*Counsel for Citizens for a Healthy Community,*
*High Country Conservation Advocates, Center*
*for Biological Diversity, WildEarth Guardians,*
*and Wilderness Workshop*

Allison N. Melton, CO Bar No. 45088
Center for Biological Diversity
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008
amelton@biologicaldiversity.org

*Counsel for Center for Biological Diversity*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE AND**
**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**


      I hereby certify that on July 13, 2018, I electronically filed the foregoing PLAINTIFFS'
OPENING MERITS BRIEF with the Clerk of the Court via the CM/ECF system, which will
send notification of such filing to other participants in this case. This brief complies with the
type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as provided by the Joint Case
Management Plan in this case, because this brief contains 12,704 words, excluding the parts of
the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


                           /s/ Laura King
                           Western Environmental Law Center
                           *Counsel for Plaintiffs*